UNITED STATES, Appellee,

v.

Sergeant Ronald D. COLE, United States Army, Appellant.

ARMY 9601487.

U.S. Army Court of Criminal Appeals.

5 Dec. 2000.

---

For Appellant: William E. Cassara (argued); Captain Paul J. Perrone, Jr., JA (on brief); Colonel Adele H. Odegard, JA; Major Leslie A. Nepper, JA; Captain Steven P. Haight, JA.

For Appellee: Captain Daniel G. Brookhart, JA (argued); Colonel Russell S. Estey, JA; Lieutenant Colonel Eugene R. Milhizer, JA; Major Patricia A. Ham, JA (on brief); Lieutenant Colonel Edith M. Rob, JA.

Before CAIRNS, Senior Judge, TRANT, and BROWN, Appellate Military Judges.

## OPINION OF THE COURT

CAIRNS, Senior Judge:

At a fully contested general court-martial, a panel of officer and enlisted members convicted the appellant of violating a lawful general regulation, premeditated murder, aggravated assault, and willful and wrongful discharge of a firearm under such circumstances as to endanger human life, in violation of Articles 92, 118, 128, and 134, Uni-

form Code of Military Justice, 10 U.S.C. §§ 892, 918, 928, and 934 [hereinafter UCMJ]. The convening authority approved the sentence consisting of a dishonorable discharge, mandatory confinement for life, forfeiture of all pay and allowances, and reduction to Private E1.

In this Article 66(c), UCMJ, appeal, the appellant asserts, inter alia, that the prosecution did not prove beyond a reasonable doubt that he was not acting in defense of another, and that the evidence was insufficient in law and fact to support his conviction for premeditated murder. We have reviewed the record of trial, the briefs submitted by counsel, and all the errors assigned by the appellant.[1] We heard oral argument in this case. We hold that the evidence is legally and factually sufficient to support the findings of guilty of premeditated murder, as well as all other findings of guilty; that the evidence disproves beyond a reasonable doubt that the appellant acted in defense of another; and that none of the other alleged errors ad-

versely affected the substantial rights of the appellant.

## FACTS

### a. The Shooting

It is uncontested that the appellant killed Specialist (SPC) Autumn Avila by shooting her once in the head with his double barrel derringer pistol. The appellant's wife, Mrs. Cole, was the only eyewitness to the shooting.

Mrs. Cole testified that, on Saturday morning prior to the shooting, the appellant departed their government family quarters in his station wagon at around 0900 hours. Sometime later in the morning, as Mrs. Cole glanced out the window, she observed the appellant drive his car into the driveway. She went to the door of the carport to see if he wanted lunch. As soon as Mrs. Cole opened the door and stepped onto the threshold, she was surprised and startled to see the victim standing to her left at a dis-

---

1. The appellant assigned the following eight errors:

#### I.
THE EVIDENCE DOES NOT SHOW BEYOND A REASONABLE DOUBT APPELLANT WAS NOT ACTING IN DEFENSE OF ANOTHER.

#### II.
THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF FACT AND LAW TO PROVE PREMEDITATED MURDER.

#### III.
THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE ACCUSED BY ORDERING DEFENSE COUNSEL TO TURN OVER THE ENTIRE SANITY BOARD REPORT, WHEN APPELLANT WAS RAISING NEITHER INSANITY NOR PARTIAL MENTAL RESPONSIBILITY AS A DEFENSE.

#### IV.
WHETHER APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEYS FAILED TO PRESENT EVIDENCE OF HIS LACK OF MENTAL RESPONSIBILITY AND HIS PHYSICAL IMPAIRMENTS TO THE PANEL, AND WHERE SAID EVIDENCE WOULD HAVE CLEARLY EXCULPATED APPELLANT.

#### V.
WHETHER THE MILITARY JUDGE ERRED IN DENYING APPELLANT'S REQUEST FOR A MISTRIAL AFTER A CID AGENT, WHO HAD BEEN SPECIFICALLY TOLD NOT TO TELL THE PANEL APPELLANT TERMINATED HIS INTERVIEW BY REQUESTING COUNSEL, VIOLATED THIS WARNING AND TOLD THE PANEL OF THE ACCUSED'S REQUEST.

#### VI.
WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION BY DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST A PANEL MEMBER, MAJOR PIGGEE, WHEN THE MILITARY JUDGE HAD CLEAR EVIDENCE MAJOR PIGGEE HAD BEEN ELECTRONICALLY SENT INFORMATION RELATING TO THE CASE, BUT MAJOR PIGGEE DENIED EVER RECEIVING SUCH INFORMATION.

#### VII.
WHETHER THE MILITARY JUDGE ERRED IN ADMITTING A LEAD PIPE AS EVIDENCE, WHEN SAID EVIDENCE WAS IRRELEVANT TO THE ISSUE OF WHETHER APPELLANT ACTED IN DEFENSE OF ANOTHER, AND WHERE THE PREJUDICIAL IMPACT OF SAID EVIDENCE SUBSTANTIALLY OUTWEIGHED ANY PROBATIVE VALUE.

#### VIII.
WHETHER THE MILITARY JUDGE ERRED, TO THE SUBSTANTIAL PREJUDICE OF THE ACCUSED, BY ALLOWING THE TRIAL COUNSEL TO CALL A SURPRISE WITNESS, PREVIOUSLY UNKNOWN TO THE DEFENSE, WHO WAS PRESENT DURING CRUCIAL TESTIMONY IN APPELLANT'S CASE.

tance from her of approximately six inches to one foot.

At this point, the appellant was standing about ten feet behind and to the left of the victim, pointing a small silver derringer pistol at the victim. The victim turned toward Mrs. Cole, exposing her back to the appellant, and stated to Mrs. Cole, "Your husband flipped me off." The appellant responded by telling his wife to "get the bigger gun."

As the victim spoke the words, "Your husband flipped me off," she quickly raised one hand and pointed toward the appellant's wife, while pointing her other hand in the direction of the appellant. Mrs. Cole observed both of the victim's hands, but she never saw a fist, a knife, or any weapon in either of the victim's hands or on her person. When the victim spoke, her voice was loud and she seemed upset; however, Mrs. Cole testified that she did not feel threatened by the victim, whom Mrs. Cole initially thought was a man. Mrs. Cole felt nervous because her husband had a gun pointed at the victim, but she specifically denied that the victim placed her in fear of death or grievous bodily harm by the circumstances of the victim's presence, actions, or demeanor.

Mrs. Cole described the situation as tense, but she testified that her husband was calm. She further testified that the appellant never issued a warning to the victim, and she did not know whether the victim ever saw the appellant pointing the pistol at her. After the appellant instructed his wife to "get the bigger gun," Mrs. Cole "heard a click and then a shot and the person fell backwards." The victim fell to the concrete floor of the carport, between the passenger side of the appellant's small station wagon and the house. A single .38 caliber round, fired from the appellant's derringer, had pierced the back of the victim's skull, lodged in her brain, and killed her.

After the appellant shot the victim, Mrs. Cole saw him go to his car, open the driver's side door, and bend over as if he were picking something up. She then went inside her home and closed the door.

A neighbor heard the shot and went to her window to investigate. From a distance of 190½ feet, she observed the appellant standing with his arms extended, hands together, holding a gun "pointed out straight." She turned away to summon her husband, and when she looked out of the window again, the neighbor observed the appellant walk around his vehicle to the passenger side, in the vicinity where the victim lay, and bend down on his knees.

Another neighbor ran outside to investigate the noise of the gunshot and noticed the victim's truck, with the driver's door open and the motor still runn'ng, parked diagonally in the street at the end of the appellant's driveway. As the neighbor approached the appellant's housing unit, he observed the victim lying on the carport pavement and saw the appellant walking in a normal fashion around his station wagon. When the appellant saw the neighbor, he calmly said, "The lady was attacking [my] wife and [I] had to shoot her. Call the police." The neighbor immediately departed to call 911.

Meanwhile, a motorist had flagged down a military policeman (MP) who was on routine patrol in the housing area, and reported that a pickup truck and a station wagon were speeding through the housing area as if the drivers were chasing each other. Within ten minutes of the report, the MP drove by the appellant's quarters and observed the victim's truck with the driver's side door open. The appellant was standing beside his station wagon, and when he saw the MP, he ran up to the MP's vehicle and said, "I just shot a woman who was attacking my wife." The appellant then returned to his house and went inside. When back-up MP assistance arrived, they apprehended the appellant, who again explained that he was protecting his wife and family. The MPs recovered from the appellant's front pocket a silver derringer loaded with one live round and one expended cartridge. The MP who was first on the scene described the appellant as "calm, but nervous."

When the MPs and paramedics attempted life-saving measures in aid of the victim, they discovered that she had neither pulse nor respiration. They were unsuccessful in reviving her. A local justice of the peace pronounced the victim dead, at the scene, of a

single gunshot wound to the head. When the Criminal Investigation Command (CID) team processed the scene, they found a kitchen knife on the cement pavement beneath the right hand of the victim. They could not see the knife until they moved her hand, which was under her right hip.

The medical examiner who performed an autopsy testified that the victim was 63 inches tall and weighed 116 pounds. In comparison, the appellant's personnel records, last reviewed by him 27 months before the shooting, reflect his height as 66 inches and weight as 130 pounds.

### b. The Appellant's Pretrial Statement

During lawful custodial questioning, properly preceded by appropriate rights warnings, the appellant told a CID agent that he departed his quarters, intending to take his derringer pistol to a friend's home for repairs. After stopping at an on-post shoppette for a small purchase, he proceeded in the direction of his friend's off-post residence. Since he had not made advance plans to visit his friend, he decided to return home to first make telephone contact. While driving toward the housing area, a person in a pickup truck passed him on the right at a high rate of speed and then slowed down in front of him, attempting to get him to stop. When the appellant took evasive action, the driver of the pickup truck made erratic maneuvers to maintain contact, and they proceeded to the appellant's house. After the appellant drove his station wagon into the carport, he observed the driver of the pickup truck stop at the end of his driveway. Sensing a threat, the appellant retrieved his unloaded derringer from the back seat of his vehicle.

According to the appellant's statement, as the driver of the pickup truck walked up the driveway, the person said, "I'm going to get you now." The appellant maintained that he did not know whether the driver was male or female, but regardless, the individual was not deterred when the appellant displayed his derringer and admonished her to leave him alone. The appellant became concerned because he was trying to protect himself with an unloaded weapon. At that point, the appellant's wife opened the door, and when the person became distracted by his wife, the appellant pulled ammunition from his cargo pocket of his pants and loaded the derringer. According to the appellant, when he told the person to leave him and his family alone, the individual lunged toward the appellant's wife, and he shot the person. The appellant admitted that he did not see any weapons in the hands of the individual.

During the course of interviewing the appellant, the CID agent learned from colleagues that a knife had been found near the body of the victim. Suspecting that the appellant had planted the knife, the agent told the appellant of a case in which a defendant had actually acted in self-defense but, instead of being completely honest with police, hid evidence and lied about being involved in a confrontation with the victim. His lies so undermined his credibility that he was convicted, even though he had, in fact, acted in self-defense. After explaining the need to be completely honest, the agent confronted the appellant with his suspicion that the appellant had planted the knife. The CID agent testified that:

> [The appellant's] response to that was that he didn't see what difference it would make if a knife had been planted on the scene or not. He still felt that it was self-defense. He ... during the course of the interview, at that point, we spoke for several minutes on it about the importance of the knife and whether or not it had been planted, and, ultimately, he told me ... at first, he denied it and then he told me that he wanted to change his answer in regard to the knife; that he knew it was wrong, at first or in the beginning, but that he felt that he was justified anyway. Then, at that point, he lowered his head, tears began to roll, and he indicated that he wanted an attorney.

(R. at 620).

### c. Ballistics

The government offered the testimony of a firearms and tool marks expert who examined and tested the derringer that the appellant used to kill the victim. The expert testified that the derringer was a single-shot, single-action firearm with two cham-

bers and corresponding upper and lower barrels. The derringer and all of its mechanisms, including the safeties, were in proper working order and met the operational standards set by the manufacturer. He testified that, "single-action means that you have to manually cock the hammer all of the way to the rear and then put the applied pressure on to the trigger with your trigger finger to fire this particular firearm." The derringer had a trigger pull of 11½ pounds, about twice the average trigger pull for an M16 rifle and more than three times that required for the Army M9 pistol in semi-automatic mode. Using this derringer, a person can fire one shot from the bottom chamber and then one from the top before having to reload.

The firearms expert testified that he examined the two cartridges recovered from the appellant's derringer. One was an intact live cartridge, consisting of a complete bullet, powder, and casing; the other was an expended cartridge casing. He also examined the expended bullet recovered from the head of the victim. Based on the unique characteristics of the tool marks and other extraneous marks on the inside of every individual firearm barrel, the expert stated that the expended bullet and empty casing had been fired through the top chamber of the appellant's derringer, "to the exclusion of all other guns in the world." Regarding the live cartridge recovered from the appellant's derringer, the expert testified:

> The cartridge that was submitted had a very light firing pin indentation on the primer, something that we refer to in the military as a "love tap". It was not consistent with a misfire; it was just a light firing pin indentation. They wanted to know if that light firing pin indentation was caused by the firing pin of this particular firearm.
>
> What I did was that I utilized some of the cartridges that were submitted to me for examination purposes. I cycled and chambered those cartridges into the top barrel and bottom barrel of this firearm. I later microscopically compared that light indentation on one of the cartridges that was submitted to me to the ones that I had tested. I was able to basically identify

that cartridge with the light indentation as having been caused by the firing pin, located in the bottom barrel or bottom chamber of this firearm.

(R. at 835–36).

By comparing the lightly indented live cartridge found in the appellant's derringer with cartridges that he tested using the firearm, the expert described the mechanism by which the indentation was made and coincidentally explained how Mrs. Cole might have "heard a click and then a shot":

> What I did, once again, was that I cycled these [cartridges] through the gun. Then I did my microscopic comparisons and I looked for these individual [firearm] characteristics. What I also determined was that the only way that this little indentation on this primer could be reproduced was with the safety in the "on" position. What I determined was that, when this hammer was cocked all the way to the rear and the firearm was in the locked position, it's consistent that the firearm would have also been in the "safe" position. The individual shooter would have attempted to fire this particular weapon from the bottom chamber. The bottom chamber was ready to fire. The safety was on. When the hammer went forward, striking the firing pin, the firing pin went forward, just far enough to give that love tap, that light indentation, against the primer of the cartridge, not enough to fire it.
>
> What happened next would have been that the individual shooter would have realized that the safety was on, cocked the hammer back to the rear again, removed the safety, and then fired one more time, but, this time, it would have fired the top barrel, the top chamber, and it subsequently would have fired.

(R. at 836–37).

### d. Evidence that the Appellant Knew the Victim

At the end of the government's case-in-chief, the trial counsel called SPC Hamrick to testify that the appellant knew the victim, SPC Avilla. The trial defense counsel objected because the witness had been present in court during a portion of the trial and

because the defense had been given such late notice of the witness. The trial counsel explained that he just learned of the evidence when he was approached by the witness at a recess. Therefore, the trial counsel could not have given earlier notice or precluded the witness from being present at the earlier session when the firearms and fingerprint experts testified. The military judge overruled the defense objection, but ensured that the defense had adequate time to interview and investigate the witness' background by reviewing her personnel records and other information. Specialist Hamrick testified two days later, after the defense rested its case.

Specialist Hamrick worked in the orderly room of the medical hold company to which the appellant was assigned. She testified that she knew both the appellant and the victim, SPC Avilla. Specialist Hamrick stated that within three days of her scheduled leave (which began five days before the shooting), she observed SPC Avilla in the orderly room playing computer games while sitting on SPC Ward's lap. Specialist Ward testified earlier in the trial that he and SPC Avilla had been lovers and had discussed marriage at one time. Specialist Avilla was wearing the Army winter physical training uniform. Specialist Hamrick remembered that the appellant entered the orderly room for coffee, a normal routine for him. Upon seeing the victim, the appellant said, "Hey, Avilla." That is when SPC Hamrick first learned the victim's name, and that is why SPC Hamrick remembered specifically that the appellant called the victim by name. After pouring a cup of coffee, the appellant sat down beside SPC Avilla, and then the three soldiers (SPC Avilla, SPC Ward, and the appellant) had a conversation about "activities that they had had over the weekend and what they were planning on doing."

Specialist Hamrick testified that the day after this sociable encounter, she saw the victim again in the orderly room. On this occasion, SPC Hamrick talked with SPC Avilla. Specialist Avilla was wearing civilian athletic sweat clothes and a blue bandana worn as a head cover. At the time of her death, SPC Avilla was wearing jeans, a civil-ian sweatshirt, and a bandana as a head cover.

## DISCUSSION

### Part I: Legal and Factual Sufficiency of the Evidence

#### a. Law

The appellant asserts in Assignments of Error I and II that the evidence was legally and factually insufficient to establish beyond a reasonable doubt his guilt of premeditated murder. He contends that the killing was justified, and not unlawful, because he acted in defense of his wife and family. The appellant argues in the alternative that, if we find beyond a reasonable doubt that he did not act in defense of another, the evidence nevertheless fails to establish beyond a reasonable doubt that he had a premeditated design to kill SPC Avilla. Therefore, the appellant contends that the highest degree of guilt we could affirm is voluntary manslaughter.

The test for legal sufficiency is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found [all] the essential elements of the [offense] beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see also United States v. Cottrill*, 45 M.J. 485, 487 (1997). For factual sufficiency, the test is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," we, the members of this court, are ourselves "convinced of the accused's guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A.1987).

In order to prove premeditated murder under Article 118, UCMJ, the government must prove the following four elements beyond a reasonable doubt:

(a) That a certain named or described person is dead;

(b) That the death resulted from the act or omission of the accused;

(c) That the killing was unlawful; and

(d) That, at the time of the killing, the accused had a premeditated design to kill.

*Manual for Courts–Martial, United States* (1995 ed.), Part IV, para. 43b(1) [hereinafter MCM, 1995].

A murder is premeditated when the thought of taking life was consciously conceived, and the act or omission by which life was taken was both intended and considered. Thus, the MCM, 1995, explains premeditated murder as:

> [M]urder committed after the formation of a specific intent to kill someone and consideration of the act intended. It is not necessary that the intention to kill have been entertained for any particular or considerable length of time. When a fixed purpose to kill has been deliberately formed, it is immaterial how soon afterwards it is put into execution. The existence of premeditation may be inferred from the circumstances.

MCM, 1995, Part IV, para. 43c(2)(a); *see also United States v. Eby*, 44 M.J. 425, 428 (1996) (accused not required to ask himself any questions, as no particular thought process is required to form a premeditated design to kill); *United States v. Matthews*, 16 M.J. 354, 379 (C.M.A.1983) ("premeditation [as defined in the MCM] falls far short of 'deliberation'"); *United States v. Levell*, 43 M.J. 847, 853 (N.M.Ct.Crim.App.1996) (premeditation is not a question of time, but of reflection, and may exist immediately following the formation of intent).

The law of premeditation is correctly stated in the model instruction found in the Military Judges' Benchbook,[2] which the military judge used to instruct the court-martial members:

> "Premeditated design to kill" means the formation of a specific intent to kill and consideration of the act intended to bring about death. The "premeditated design to kill" does not have to exist for any measurable or particular length of time. The only requirement is that it must precede the killing.

It is a complete defense to a charge of murder that the accused acted in defense of another, provided the accused does "not use more force than the person defended was lawfully entitled to use under the circumstances." Rule for Courts–Martial 916(e)(5) [hereinafter R.C.M.]. Thus, the principles of self-defense apply to defense of another. That is, the accused may use deadly force to protect another if the accused: (1) apprehended, on reasonable grounds, that death or grievous bodily harm was about to be inflicted wrongfully on the person defended; and (2) believed that the force he used was necessary for protection of that person against death or grievous bodily harm. *See* R.C.M. 916(e)(1).

■■■■ The test for the first part of the defense is objective and is satisfied if a reasonably prudent person under the same circumstances as the appellant would have apprehended that death or grievous bodily harm was about to be inflicted on Mrs. Cole.[3] The second part of the defense is subjective and is viewed through the eyes of the appellant. Here, the appellant must have actually believed that the amount of force he used

---

2. U.S. Dep't of Army, Pam. 27–9, Legal Services: Military Judges' Benchbook, para. 3–43–1d (1 May 1982).

3. In this appeal, the appellant asserts he acted in defense of both his wife and children. In his brief, he maintains alternatively that he was defending his wife, or he was defending his wife *and* children. In much of the defense brief, the analysis focuses on the appellant's defense of Mrs. Cole, with no reference to the children. We understand this approach. Although there was testimony that the appellant's children were in the house at the time of the shooting, they were never physically present outside the house before, during, or after the shooting. Nevertheless, we acknowledge that the evidence raised the issue of whether the appellant acted in defense of both his wife and children. Our analysis, however, focuses on the efficacy of this defense vis-à-vis Mrs. Cole because she was actually in the presence of the appellant and SPC Avilla at the time of the shooting. We find it unnecessary to specifically analyze the defense of another in terms of the defense of both Mrs. Cole and the children. If the appellant was entitled under the law to use deadly force to defend Mrs. Cole, then that constitutes a complete defense. Likewise, if the appellant could not lawfully defend Mrs. Cole by means of deadly force, the law would not afford him a greater defense of family members who were in less danger of bodily harm because they were farther away from the threat. In conducting our analysis, however, we do recognize and consider the effect on the appellant of his children's presence in the home.

was necessary to protect his wife against death or grievous bodily harm. Additionally, in using deadly force to defend his wife, the appellant "stands in the shoes" of the person defended; he is entitled to use no more force than Mrs. Cole would have been entitled to use in defending herself under the circumstances. *See* R.C.M. 916(e)(5); *United States v. Scott*, 40 M.J. 914, 917 (A.C.M.R. 1994), *aff'd*, 42 M.J. 457 (1995). Once the defense has been raised by the evidence, the prosecution has the burden of proving beyond a reasonable doubt that the defense did not exist. *See* R.C.M. 916(b); *Scott*, 40 M.J. at 917.

#### b. Analysis

Viewing the evidence in the light most favorable to the prosecution, we are satisfied that a rational trier of fact could find all the essential elements of premeditated murder beyond a reasonable doubt. We also conclude, as our subsequent analysis reflects, that a rational trier of fact would be convinced beyond a reasonable doubt that the appellant did not act in defense of another. Accordingly, we hold that the evidence was legally sufficient. Likewise, our de novo review of the record convinces us beyond any reasonable doubt that the appellant specifically intended to kill SPC Avilla, that he considered the act of killing her before pulling the trigger of his derringer, and that he was not acting in defense of another when he killed SPC Avilla.

As a road map of what is fully discussed in the next two sections, we are persuaded that the appellant was not acting in defense of another but rather intended, with premeditated design, to kill SPC Avilla based on the following facts which we find utilizing our Article 66, UCMJ, fact-finding power. First, the appellant—who had familiarity and expertise with handguns—calmly and deliberately shot SPC Avilla in the back of her head with his derringer from a distance of between six to ten feet. At the time of the shooting, SPC Avilla was facing away from the appellant and did not see his derringer. Second, in order to fire the fatal shot, the appellant had to aim, cock, and pull the trigger. Because one of the weapon's safeties was engaged, the appellant had to disengage the safety, recock the weapon, reaim at his victim's head, and pull the trigger again. Third, prior to the shooting, SPC Avilla did not threaten, physically menace, attack, or lunge at Mrs. Cole. Fourth, no reasonable person under the same or similar circumstances would have perceived SPC Avilla's actions to pose a threat of grievous bodily harm or death to himself or his family. Fifth, the appellant tried to manufacture evidence of a threat of deadly violence from his victim by planting a knife under her dead body. Sixth, the appellant lied about why he had the derringer in his possession the day of the shooting (the fictitious need for repair), about not knowing his victim, about not knowing whether the victim was male or female, and about perceiving an attack on his wife—all of which seriously undermine his claim of defense of another and lack of premeditation.

#### (1) Premeditation

■■■ Lest we be diverted by the scant evidence of the appellant's motive for killing SPC Avilla, let us be clear that motive is not a required element of the offense of premeditated murder. Motive, of course, frequently assists the trier of fact in deciding issues of intent, and in murder cases, it may well be valuable circumstantial evidence on the issue of premeditation. *See generally United States v. Davis*, 49 M.J. 79, 82 (1998); *United States v. Hoskins*, 36 M.J. 343, 347 (C.M.A. 1993). Even though this record leaves us to speculate why the appellant killed SPC Avilla, the facts of this case establish beyond a reasonable doubt the appellant's premeditated design to kill.

The appellant's familiarity and expertise with guns in general, and the murder weapon in particular, cannot be denied. The appellant was a trained infantryman who scored as an "expert" with an M16 rifle and who owned at least three handguns. Mrs. Cole testified that the appellant checked his weapons daily to ensure they were loaded and in working order, and he carried handguns routinely when he left his quarters. The appellant's personal notes indicate that he studied the proper method for aiming and firing his derringer pistol.

The testimony of the medical examiner, the firearms examiner, and Mrs. Cole establish that the appellant shot SPC Avilla in the back of the head from a distance of between six and ten feet. Both the appellant and his victim were standing still at the time the appellant killed SPC Avilla.

The appellant chose to take dead aim from a distance of ten feet or less at the back of SPC Avilla's head, a part of the human anatomy particularly vulnerable to the deadly force of a bullet. Common sense and human experience leave no doubt that shooting a bullet from a handgun into the head of a person is likely to produce death. By targeting the victim's head, instead of a less critical part of her body, we can and do infer that this trained marksman intended to kill.

The appellant performed a series of physical acts leading up to and including the shooting in a calculated, calm manner and with no outward manifestations of passion. By the appellant's own admission, while the victim spoke to his wife, he loaded his derringer. Mrs. Cole testified that her husband was "calm" and "didn't seem tense" immediately before the appellant pulled the trigger. Mrs. Cole further testified that the appellant neither displayed his derringer to the victim nor verbally warned her before he pulled the trigger. The appellant's calm, deliberate demeanor prior to his killing reflects a calculated murder, not the emotional reaction of a person acting out of fear for the life of a spouse or child.

According to the convincing and undisputed testimony of the firearms expert, the appellant had to pull the hammer of the derringer back with his thumb (or his other hand), lock the hammer into place, and apply 11½ pounds of pressure to the trigger. When the safety prevented the derringer from firing, the appellant had to pull the hammer back again; lock it; remove the safety; aim; and again apply 11½ pounds of pull to the trigger. In targeting such a vital part of the victim's body, and then taking the series of steps necessary to complete the act of killing, we are convinced that before the appellant pulled the trigger, he formed the intent to kill SPC Avilla, and he considered and reflected upon the acts intended to bring about

her death. We find beyond a reasonable doubt that the appellant's killing of SPC Avilla was premeditated.

Mrs. Cole testified that immediately after her husband shot the victim, he walked over to the driver's side of his car and bent over "like he was picking something up." Although Mrs. Cole then went inside, her neighbor helped complete the picture by testifying that the appellant circled back between the passenger side of the car and the house, i.e., the area where the victim laid, and he bent down on his knees. The appellant's own statement to CID corroborates, and we find as fact, that he then planted a knife under the body of the victim. The logical inference to be drawn from the appellant's actions under these circumstances is that he was trying to manufacture an excuse for killing SPC Avilla because he knew his killing was unjustified. His attempt to cover up his crime, calculating his moves carefully and deliberately from the time he loaded his derringer until he planted the knife, supports our finding that he acted intentionally and with premeditation.

### (2) Defense of Another

■ The appellant claims on appeal that the evidence does not show beyond a reasonable doubt that he was not acting in defense of another. In his pretrial statements at the scene and later in custody, the appellant claimed that SPC Avilla was attacking his wife and family, so he "had to shoot her." We reject the appellant's claim as incredible and unsupported by the evidence.

The testimony of Mrs. Cole is the most persuasive evidence that the appellant was not defending his wife and family when he shot SPC Avilla. As summarized earlier, Mrs. Cole testified credibly and compellingly that she was not in fear of death or grievous bodily harm as the result of SPC Avilla's presence, actions, or demeanor. She testified that SPC Avilla neither lunged at her, as the appellant claimed, nor made any threatening moves toward her. Mrs. Cole saw no weapons in SPC Avilla's hands, a fact that the appellant admitted to CID later. While SPC Avilla spoke in a loud tone and was upset, she simply stated, "Your husband flipped me off." Although we concede these

words could be interpreted as accusatory under the circumstances, they hardly constituted a credible threat of bodily harm, let alone death or grievous bodily harm.

We acknowledge that there was evidence that the victim had left her place of duty earlier that day in an angry state of mind because she had been counseled for failure to follow instructions and displaying a bad attitude. There was also evidence that the appellant and victim were engaged in some form of vehicular cat-and-mouse game, with the appellant claiming the victim had cut him off and followed him. The fact that the victim exited her vehicle without turning off the engine or closing the car door supports a theory that she was upset. However, this evidence neither overcomes the objective evidence that SPC Avilla posed no reasonable physical threat to Mrs. Cole, nor dilutes Mrs. Cole's own testimony that she, personally, was not in fear of attack.

We find as fact that SPC Avilla did not attack or make an offer of violence to Mrs. Cole. We further find as fact that the appellant lied when he reported to a neighbor and to the MP at the scene that SPC Avilla was attacking his wife. The appellant continued to lie when he told CID that he told SPC Avilla to leave him and his family alone, but that she lunged at his wife. None of the evidence supports his statements, and his wife's testimony contradicts them. The appellant lied about this fictional attack for the same reason that he misrepresented the truth by planting the knife under his victim—he tried to justify his murder of SPC Avilla. His series of lies underscore the appellant's premeditated design to kill.

Considering all the surrounding circumstances which are arguably favorable to the appellant's theory—that SPC Avilla and the appellant had some form of confrontation while driving their vehicles; that SPC Avilla left her car running and the door open to pursue the matter; that SPC Avilla was upset; that SPC Avilla told Mrs. Cole in a loud voice that the appellant "flipped [her] off"; that SPC Avilla made the statement to Mrs. Cole while she was within six to twelve inches of Mrs. Cole, who was standing in the doorway of the appellant's home; that the

appellant's children were inside the home; that SPC Avilla was pointing at Mrs. Cole with an empty and open hand—we still conclude these circumstances would not lead a reasonable person to believe that SPC Avilla was about to inflict death or grievous bodily harm on Mrs. Cole or her children.

Finally, the appellant's deliberate act of planting the knife under his victim completed the evisceration of his claim that he acted in defense of another. One who reasonably apprehends that death or grievous bodily harm is about to be inflicted on another—and employs deadly force to defend the threatened person, actually believing such force is necessary to repel the attack—has no legitimate need thereafter to plant evidence. While we acknowledge that people may act irrationally in emotionally charged or stressful situations, all the evidence demonstrates that the appellant acted in a deliberate, calm manner.

Having concluded that the appellant could not have reasonably apprehended that his family was in imminent danger of death or grievous bodily harm, we find it unnecessary to address whether the appellant in fact believed that the deadly force he used was necessary to protect his family. We hold that no reasonable factfinder could conclude that a person under the same circumstances as the appellant would reasonably believe his family was in danger of death or grievous bodily harm. Accordingly, we find that the evidence establishes beyond a reasonable doubt that the appellant was not acting in defense of another when he killed SPC Avilla.

### Part II: Ruling on Mistrial

In response to a pretrial defense motion in limine, the prosecution agreed that the CID agent who interviewed the appellant on the day of the shooting should not disclose to the members that the appellant invoked his right to counsel after making admissions. Despite having been warned by the trial counsel not to disclose the invocation, the CID agent inexplicably testified before the members that the appellant requested a lawyer after the appellant had substantially admitted to having planted the knife found under SPC

Avilla's body.[4] The appellant contends on appeal that the military judge erred in not granting the defense's motion for a mistrial as a remedy for the excluded testimony coming before the members.

The military judge conducted two Article 39(a), UCMJ, hearings on the mistrial issue and granted the defense an overnight recess to research the issue. After hearing argument, the military judge denied the defense motion for a mistrial. Instead, he gave the following curative instruction to the members:

> Court members, before we broke yesterday, you heard Special Agent McNally testify that the accused had exercised his constitutional rights at a point in the interview with him. The fact that the accused did so in this case must in no way be held against him, nor may you make any inference from the fact that he may have done so. You must disregard this.
>
> What does matter is that the accused always has and had a right to exercise his constitutional rights and no adverse result may obtain from his exercise of these constitutional rights. You may not infer guilt or any other fact from his exercise of these constitutional rights.

(R. at 666).

Following the instruction, the military judge carefully conducted individual voir dire of the members and received assurances from the individual members that they would follow the instruction and not hold against the accused the fact that he invoked his constitutional rights. We find that each member forthrightly expressed not only a commitment to follow the instruction, but also a sincerely held belief that everybody is entitled to exercise their constitutional rights without having such an invocation held against them. None of the members thought the matter would enter their mind during deliberations, and if it did, they could set it aside.

■■■■ "Declaration of a mistrial is a drastic remedy, and such relief will be grant-

ed only to prevent a manifest injustice against the accused." *United States v. Rushatz*, 31 M.J. 450, 456 (C.M.A.1990) (citations omitted); *see also United States v. Hamilton*, 41 M.J. 22, 26 (C.M.A.1994). A mistrial is appropriate when circumstances arise during the trial which "cast substantial doubt upon the fairness of the proceedings." R.C.M. 915(a). Great caution should be exercised when considering a mistrial, and giving a curative instruction is the preferred remedy when members have heard inadmissible evidence, provided the instruction avoids prejudice to the accused. *See* R.C.M. 915(a) discussion; *Rushatz*, 31 M.J. at 456. The decision to grant or deny a mistrial is within the sound discretion of the military judge, and we will not reverse a military judge's denial of a mistrial "absent clear evidence of abuse of discretion." *Rushatz*, 31 M.J. at 456. "Thus, the issue is whether the curative instruction avoided prejudice to appellant [in this case] or whether, instead, the failure to declare a mistrial was an abuse of discretion by the judge." *United States v. Evans*, 27 M.J. 34, 39 (C.M.A.1988).

■■■■ The military judge gave clear and proper instructions to the members, advising them that they could not consider the evidence. Each member assured the military judge and counsel that he would follow the instructions and in no way would hold the appellant's invocation of his constitutional rights against him. Not only did all the members express a sincere acceptance of the instructions, we have no doubt from the record before us that they scrupulously followed them. Accordingly, we are convinced that the potential prejudice was eliminated and cured by the military judge's instructions. Under these circumstances, there is no doubt about the fairness of the proceedings. We hold, therefore, that the military judge did not abuse his discretion in denying the motion for a mistrial.

Assuming, for analysis purposes only, that the military judge erred in denying the mistrial, we are convinced such error was harmless beyond a reasonable doubt. The

---

4. *See* CID agent's testimony quoted in the "FACTS" portion of this opinion under the subti-

tle, "b. The Appellant's Pretrial Statement."

appellant invoked his rights immediately after admitting, for all practical purposes, that he planted the knife. Thus, if the members failed to follow the military judge's instruction to disregard the appellant's invocation of his rights, they could have construed such testimony as corroborating evidence that the appellant planted the knife. However, the admissible evidence already before the members that the appellant planted the knife was overwhelming. It consisted, in part, of the appellant's own admissible testimony that: (1) he did not see any difference whether the knife had been planted because he was acting in "self-defense"; (2) "he knew [planting the knife] was wrong, at first or in the beginning, but that he felt he was justified anyway"; and (3) he wanted to change his earlier denial that he had planted the knife.

Significantly, the appellant's admissions that he planted the knife dovetailed with other strong corroborative evidence that he planted it. First, Mrs. Cole testified that she did not see SPC Avilla with a weapon of any kind. Second, the appellant admitted that he did not see SPC Avilla with a weapon. Third, the victim's former lover testified that he did not recognize the kitchen knife as one belonging to, or similar to, any owned by the victim. Fourth, Mrs. Cole testified that the appellant went into his car immediately following the shooting and bent over as if he were picking something up. Fifth, a neighbor testified that she saw the appellant walk back around his car and bend down on his knees in the vicinity of where the victim laid dead. Sixth, a fingerprint expert testified that although there were no ascertainable fingerprints on the handle of the knife because of its physical composition, he did identify a latent print made by the middle joint of SPC Avilla's right index finger on the blade of the knife. The print was about half way between the handle and the tip of the knife and was made in such a manner that her finger had to be perpendicular to the length of the blade at the time of contact.

Given the compelling strength of the admissible evidence that the appellant planted the knife, we are confident that there was not a reasonable possibility that the CID agent's improper testimony contributed to the appellant's conviction of the offenses. The inescapable conclusion from all the independent evidence was that the appellant planted the knife. The appellant's request for counsel was within the context of whether he planted the knife, not whether he was admitting guilt of premeditated murder. Therefore, there is no reasonable possibility that the improper testimony might have contributed to the appellant's conviction. See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); United States v. George, 52 M.J. 259, 261–62 (2000); United States v. Bins, 43 M.J. 79, 86 (1995). Accordingly, if there was error, the error was harmless beyond a reasonable doubt.

## Part III: The Sanity Board and Effective Assistance of Counsel

In his third assignment of error, the appellant asserts that the military judge erred "by ordering the defense counsel to turn over the entire sanity board report, when appellant was raising neither insanity nor partial mental responsibility as a defense." Closely related to this assertion is the appellant's fourth assignment of error in which he claims denial of effective assistance of counsel because "his attorneys failed to present evidence of his lack of mental responsibility and his physical impairments to the panel."

### a. Background

Prior to trial, the trial defense counsel requested that the appellant undergo a mental examination, commonly known as a sanity board, under the authority of R.C.M. 706. In their request, the defense stated they had reason to believe that the appellant lacked the capacity to stand trial and was not mentally responsible at the time of the offense based on the following: the appellant sustained head trauma in a 1977 automobile accident; he suffered a second head injury in 1993, when the hatch of a Bradley` fighting vehicle hit his head; doctors had previously conducted a neurological examination and conducted psychiatric therapy; prior to preferral of the charges, the appellant was pending medical separation from the Army; and the appellant was a survivalist who believed he must be prepared to protect his family in case of natural disaster or anarchy.

Pursuant to the defense request, an R.C.M. 706 mental examination was conducted. Under the authority of R.C.M. 706(c)(3)(A), the board issued to the parties a statement of its ultimate conclusions that: (1) the appellant did not suffer from a severe mental disease or defect at the time of the incident; (2) at the time of the shooting, the appellant was able to appreciate the nature and quality or wrongfulness of his conduct; and (3) the appellant had sufficient capacity to understand the nature of the proceedings and to cooperate intelligently in his own defense. Pursuant to R.C.M. 706(c)(3)(B), the board's full report was provided to the defense.

During preliminary motions, the government moved to compel the defense to disclose the full contents of the board's report, other than any statements made by the accused.[5] The government asserted entitlement to the contents of the report under Mil.R.Evid. 302(c) because the defense had requested the government to produce Doctor (Dr.) Maher and Dr. Warden, who were defense expert witnesses but not members of the sanity board. For purposes of the motion, the parties agreed with the following summary of the anticipated testimony of these defense witnesses:

The Defense has proffered that Dr. Maher, a neurologist, will states [sic] his conclusions that SGT Cole does appear to have judgment processing difficulties and that SGT Cole has a brain lesion in an area that is believed to control the understanding of language. He will also testify about the substantial brain damage that the accused sustained and how the brain compensates for that loss. Dr. Warden, a Neurological Psychiatrist, and the Director of the Traumatic Brain Injury Study that is an ongoing study since the Vietnam War era, will testify to clinical features of patients with traumatic brain injury. It is anticipated that she will testify that there are prominent behavioral traits to patients with traumatic brain injury, such as suspiciousness and isolativeness [sic]. There are also intellectual changes such as the capacity to concentrate, abstract reason, remember and process information. The Defense offers this evidence to prove the subjective prong of defense of another.

(AE XLIII).

The defense objected to disclosure of the full contents of the board's report. They argued that they did not intend to present an insanity defense, but rather the proffered testimony of the experts would be presented solely on the issue of whether the appellant believed that the force he used was necessary to protect his family. Therefore, the evidence was relevant to the second prong of defense of another and was not offered on the issue of mental responsibility or partial mental responsibility. The defense argued that because they were not offering expert testimony concerning the "mental condition" of the accused within the meaning of Mil. R.Evid. 302(c), the military judge should not order disclosure of the full contents of the report prepared pursuant to R.C.M. 706.

During the two pretrial motions sessions conducted on the issue of the production of the full report of the sanity board, the military judge made it clear that he would not rule until the factual predicate had been established at trial. He stated initially that if the defense raised the mental condition of the accused through expert witnesses, he would be inclined to order the release of everything, except the statements of the accused, if the government made a motion under Mil.R.Evid. 302(c). After the defense argued that they were not raising mental responsibility or partial mental responsibility, the military judge ordered briefs.

At the next Article 39(a), UCMJ, session, counsel presented arguments, and the military judge again expressed his inclination to release the full board report if the defense raised mental responsibility or partial mental

---

**5.** In accordance with Military Rule of Evidence 302(c) [hereinafter Mil.R.Evid.], the government explicitly agreed they were not entitled to statements made by the appellant to the sanity board unless the defense first introduced such statements. In order to avoid awkward parenthetical clauses in the remainder of this opinion, we will not repeat the language of Mil.R.Evid. 302(c), "other than any statements made by the accused," when referring to the issue of disclosure of the full contents of the sanity board report.

responsibility through their expert witnesses. But he emphasized several times that he could not and would not make a ruling until the testimony had been presented and the issue was ripe for a ruling. The defense never offered the testimony of their experts, Dr. Maher and Dr. Warden. At the conclusion of their case-in-chief, the defense instead asked for a side-bar Article 39(a), UCMJ, session at which the following colloquy occurred:

DC: Sir, based on your ruling regarding the motion by the government regarding M.R.E. 302, the defense rests.

MJ: Counsel, I want you to understand, with regard to my ruling on that, that that was a prospective ruling and one which I have not made a decision on because I have not seen your evidence. So, it's the court's position that I have not ruled on that issue. I just want you to understand that.

DC: I do, but I want that noted for the record, sir.

(R. at 933).

In addition to his assertion that the military judge erred on this issue, the appellant has raised on appeal the issue of ineffective assistance of counsel for their failure to present an insanity defense or evidence of the appellant's physical impairments. Following appellate oral argument, wherein there was discussion concerning who bears the burden on issues of ineffective assistance of counsel, the civilian and military appellate defense counsel moved that we consider Defense Appellate Exhibits A, B, and C. We grant these motions and direct that the exhibits be attached to the record.

Defense Appellate Exhibit A contains a Neuropsychological Evaluation of the appellant, dated June 6, 1995, authored by Dr. William J. Holden, Clinical Neuropsychologist, U.S. Army Medical Department Activity, Fort Hood, Texas; a Medical Evaluation Board report pertaining to the appellant, signed by Major (Doctor) Hector F. Colon, Medical Corps, Fort Hood, Texas, final copy dated 7 October 1994; a Memorandum for Major David T. Orman, Medical Corps, Chief, Department of Psychiatry, Fort Hood, Texas, SUBJECT: Neuropsychological Eval-

uation of SGT Ronald Douglas Cole, dated 18 March 1993, with addendum; and five pages of a Report of Medical History pertaining to the appellant, dated 27 July 1994.

Defense Appellate Exhibit B is the full Psychological Evaluation Report, prepared pursuant to R.C.M. 706, signed by Colonel Franklin R. Brooks, Chief, Department of Psychology, Brooke Army Medical Center, Fort Sam Houston, Texas, and Captain (Promotable) Rebecca A. Dyer, Licensed Clinical Psychologist, dated 23 February 1996. The appellate defense counsel moved we consider this document in camera and that it remain under seal, unavailable to the government. We have previously ordered briefs on the issue of whether we should consider the report without disclosure to the government. Out of an abundance of caution, we grant the defense motion to consider the report in camera and to maintain it under seal.

Defense Appellate Exhibit C is a Memorandum for Captain Michael J. Deegan [Trial Defense Counsel], Subject: Review of Case of Sergeant Ronald D. Cole, authored by Lieutenant Colonel (Doctor) Cornelius Maher, Chief, Out–Patient Neurology Service, Walter Reed Army Medical Center, dated 30 July 1996.

### b. Law

#### (1) Release of Board's Psychological Evaluation Report

When there is reason to believe that an accused lacks mental responsibility for any offense charged or lacks mental capacity to stand trial, a mental examination will be conducted by a board of one or more physicians (normally psychiatrists) or clinical psychologists. When such mental examination is ordered, the board must make distinct findings on whether the accused suffered "a severe mental disease or defect," and if so, whether such severe mental disease or defect rendered the accused "unable to appreciate the nature and quality or wrongfulness of his or her conduct." R.C.M. 706(c)(2)(A), (C). Further, if the accused's mental capacity to stand trial is in question, the board must make a finding as to whether, as a result of a mental disease or defect, the accused is unable "to understand the nature of the pro-

ceedings and to conduct or cooperate intelligently in [his] defense." R.C.M. 706(c)(2)(D).

Under the provisions of R.C.M. 706, the board's ultimate conclusions on these issues shall be distributed to all counsel in the case. The full report of the board shall be furnished to the defense counsel, but not to the trial counsel. *See* R.C.M. 706(c)(3)(A), (B). Upon motion at trial, the military judge shall order release to the prosecution of the full contents, other than any statements made by the accused,[6] of any such R.C.M. 706 report "[i]f the defense offers expert testimony concerning the mental condition of the accused." Mil.R.Evid. 302(c).

■■■■ A military judge enjoys considerable discretion in deferring a ruling on a motion in limine until the issue actually arises at trial. *See United States v. Cannon,* 33 M.J. 376, 382 (C.M.A.1991); *United States v. Sutton,* 31 M.J. 11, 16 (C.M.A.1990). A military judge may exercise this discretion even though it may chill the presentation of defense evidence or affect substantial strategic decisions such as whether the accused will testify. *See Cannon,* 33 M.J. at 382. Deferral is appropriate because it allows for the development of a more fully defined factual and legal context before ruling. *See United States v. Jones,* 43 M.J. 708, 710 (A.F.Ct.Crim.App.1995). We review a military judge's decision to defer ruling on preliminary motions for abuse of discretion.

### (2) Effective Assistance of Counsel

■■■■ Members of the armed forces are entitled to effective assistance of counsel before, during, and after trial. *See United States v. Russell,* 48 M.J. 139, 140 (1998); *United States v. Hicks,* 47 M.J. 90, 92 (1997). When evaluating claims of ineffective assistance of counsel, the two-pronged test enunciated in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), applies:

First, the [appellant] must show that counsel's performance was deficient. This re-

quires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [appellant] by the Sixth Amendment. Second the [appellant] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [appellant] of a fair trial, a trial whose result is reliable.

*See also United States v. Scott,* 24 M.J. 186, 188 (C.M.A.1987).

■■■■ The burden is upon the appellant who claims ineffective assistance of counsel to establish each prong of *Strickland.* In meeting this burden, an appellant "must surmount a very high hurdle" (*United States v. Moulton,* 47 M.J. 227, 229 (1997)), and overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" (*Strickland,* 466 U.S. at 689, 104 S.Ct. 2052).

■■■■ The issue of ineffective assistance of counsel is a mixed question of law and fact. Whether counsel's performance was deficient, and if so, whether it was prejudicial, are questions we review de novo. *See United States v. Wean,* 45 M.J. 461, 463 (1997). "Because '[j]udicial scrutiny of counsel's performance must be highly deferential,' the appellate courts will not second-guess the strategic or tactical decisions of the trial defense counsel." *United States v. Clemente,* 51 M.J. 547, 550 (Army Ct.Crim.App. 1999) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052).

### c. Discussion

### (1) Release of Board's Psychological Evaluation Report

■■■■ Contrary to the appellate defense counsels' attempts to persuade us otherwise, the record in this case convincingly establishes that the military judge did not rule on whether the contents of the full sanity board report would have to be released to the prosecution, should the defense present the

---

**6.** Under Mil.R.Evid. 302(a), the accused has a privilege, subject to exceptions specified in Mil. R.Evid. 302(b), "to prevent any statement made by the accused at a mental examination ordered under R.C.M. 706 and any derivative evidence obtained through [the] use of such a statement from being received into evidence against the accused on the issue of guilt or innocence or during sentencing proceedings."

testimony of its experts. Instead, the military judge deferred the decision until such time that the defense presented the testimony of its expert witnesses. Moreover, at each of several pretrial discussions on the issue, the military judge made it clear to the parties that he was deferring the ruling until he had the opportunity to hear the experts testify at trial. Finally, when the defense rested their case without presenting the testimony of its experts, the military judge ensured they understood that he had not ruled.

The military judge did not abuse his discretion by deciding to defer his ruling until the experts testified. By deferring, he could better determine whether the expert testimony constituted evidence "concerning the mental condition of the accused" within the meaning of Mil.R.Evid. 302(c). If expert testimony concerns the mental condition of an accused, the rule requires the military judge, upon motion, to order the full board report, less statements made by the accused, released to the prosecution. Even though the trial defense counsel in this case argued that the experts would offer evidence *only* regarding prong two of defense of another—and *not* regarding the issue of mental responsibility—it was not clear during pretrial sessions whether such testimony would, in fact, concern the mental condition of the accused and thus trigger the disclosure provisions of Mil.R.Evid. 302(c). As the military judge pointed out, despite the intentions of the defense team, the experts' testimony could raise the issues of mental responsibility or partial mental responsibility. Further, testimony that the accused suffered physical brain damage which affected his judgment and impacted his ability to interpret language—even if offered only on the issue of the subjective prong of defense of another—arguably concerns the mental condition of the accused under Mil.R.Evid. 302. *See generally United States v. Norfleet*, No. ACM S29280, 1998 WL 433002 (A.F.Ct.Crim.App. July 22, 1998), *aff'd*, 53 M.J. 262 (2000).

We need not decide, however, whether the expert testimony may have concerned the mental condition of the accused within the meaning of Mil.R.Evid. 302(c). Because the military judge did not rule, we need only determine whether the military judge abused his discretion in deferring the ruling until the evidence was presented at trial. It is within the sound discretion of a military judge to require the development of the factual and legal context before he rules. *See Jones*, 43 M.J. at 710. Based on the proffer alone, a military judge would have difficulty determining whether the expert testimony in this case concerned the mental condition of the appellant under Mil.R.Evid. 302(c). As the trial litigation and the appellate briefs demonstrate, the issue faced by the military judge was novel and not settled. Particularly when the law and facts are unclear, a military judge should have the benefit of the actual expert testimony, within the full context of the trial, before having to rule on whether protected evidence must be released under Mil.R.Evid. 302(c). We hold that the military judge was well within his discretion to defer ruling on the issue in this case.

One other matter merits discussion. Both at trial and on appeal, the defense has maintained that the testimony of these experts was relevant only on the issue of prong two of defense of another—whether the appellant actually believed the deadly force that he used was necessary under the circumstances. As we have previously held, the evidence simply did not support prong one; that is, a person under the same circumstances as the appellant could not have reasonably feared that death or grievous bodily harm was about to be applied to his wife or family. Given that defense of another collapsed when the objective prong failed, the expert testimony at issue—which, according to the defense theory, was relevant *only* to the subjective prong two—would have been of no benefit to the accused. Therefore, any assertion of error regarding the military judge's handling of this issue is a moot point.

### (2) Effective Assistance of Counsel

 In his fourth assignment of error, the appellant asserts that his trial defense counsel were ineffective because they failed to present evidence of his lack of mental responsibility and of his physical impairments. In his brief, the appellant claims that "Dr. Maher and Dr. Warden would have testified [that] appellant suffered a severe

brain lesion and, therefore, was unable to understand the nature and quality of his actions." He reasons that the trial defense counsel's performance was deficient under *Strickland* because "[h]ow else [do you] explain not putting on a case, when you have evidence which exculpates your client?"

The explanation lies in an obvious tactical decision faced by the trial defense counsel. On the one hand, the record and appellate exhibits reveal that the appellant suffered two documented head injuries, one in 1977 and another in 1993. It appears the first injury was substantial and caused a permanent lesion in the appellant's brain.[7] Doctor Maher and Dr. Warden, who presumably reviewed the records without interviewing the appellant, were available to testify concerning the effects of these injuries on the appellant's cognitive ability. Although we are left to speculate as to their precise testimony, the proffer quoted earlier in connection to the Mil.R.Evid. 302 motion indicates, in general terms, they would testify that: the appellant has "judgment processing difficulties"; he has a brain lesion "that is believed to control the understanding of language"; although the appellant sustained substantial brain damage, the brain has compensated for that loss; behavioral traits of patients with traumatic brain injury include "suspiciousness and isolativeness [sic]"; and such patients may undergo "intellectual changes such as the capacity to concentrate, abstract reason, remember and process information."

In his pretrial memorandum to the trial defense counsel (Defense Appellate Exhibit C), Dr. Maher elaborated on his review of the appellant's medical record. After providing his expert neurological interpretation of the appellant's brain damage, he opined that he would expect the appellant "would have significant problems with [ ] aspects of language." He stated that the numerous neurological evaluations show that "[appellant] has had difficulties communicating with his wife" and others. He speculated that the appellant's communication problems may have affected his duties as a fire-team leader and

resulted in paranoid behavior. Doctor Maher concluded that the appellant's "residual brain lesion is substantial," but that "[t]he fact that he has recovered much of his neurologic function indicates that his brain has been able to compensate for the loss." Further, he stated that the appellant "does appear to have judgment processing difficulties, at least under stress," but he referred the defense counsel "to a psychiatrist to discuss more competently any questions of paranoia and behavioral changes."

Contrary to the appellate defense counsel's premise that the trial defense counsel failed to introduce evidence that would exculpate their client, the proffer and the appellate exhibits indicate that neither Dr. Maher nor Dr. Warden expressed an opinion that the appellant suffered a severe mental disease or defect, or that he was unable to understand the nature and quality or wrongfulness of his conduct. However, during the litigation concerning release of the sanity board's report, the trial counsel stated that he had interviewed one of the defense experts who told him that "he believes that the accused could not appreciate the nature and quality of his action."

In summary, the trial defense counsel could have presented expert testimony that the appellant had sustained substantial brain damage but that the brain has compensated for the loss. Their experts would have testified that the injuries affected the appellant's ability to communicate, to process judgments, and to understand language. According to these experts, the appellant's brain damage likely caused some degree of paranoia. One of the experts may have opined that the appellant could not appreciate the nature and quality of his acts.

On the other hand, the defense was faced with the sanity board's conclusions that the appellant did not suffer a severe mental disease or defect and that the appellant was able to appreciate the nature and quality or wrongfulness of his conduct. The defense also had read the detailed matters in the full report of the board which supported its con-

---

7. The appellant sustained the injury while an active duty Marine. Sometime after the injury, he was discharged. After a break in service, he enlisted in the Army. Presumably, he was considered qualified for enlistment despite his brain injury.

clusions. This thirty-seven page document, which we have examined in camera, is an extraordinarily comprehensive report based upon the following: a battery of thirteen psychological tests; clinical interviews of the appellant; the appellant's medical records, including mental health records and neuropsychological evaluations pertinent to his brain injuries; clinical interviews of eight witnesses; telephonic interviews of the appellant's wife and mother; a CID report of investigation; nine documents and photographs; seventeen sworn witness statements; Mrs. Cole's Article 32, UCMJ, testimony; video tapes of the scene; a physical inspection of the victim's pickup truck; an inspection of all the physical evidence gathered by CID; autopsy photographs; and the victim's medical records. The board's narrative report contains not only cogent analysis in support of its ultimate conclusion that the appellant was mentally responsible, it contains other evidence adverse to the interests of the appellant which a rational defense counsel would want to prevent the prosecution from obtaining.[8]

During the motions litigation, the military judge revealed his inclination to release the full board report under Mil.R.Evid. 302(c), if the defense presented expert testimony concerning the appellant's mental condition at the time of the offense. As previously discussed, the defense tried valiantly to preclude the application of the mandatory release provision of Mil.R.Evid. 302 by arguing that the evidence concerned the appellant's physical impairment, not his mental condition, and that it was relevant only to prong two of defense of another. However, given the plain language of Mil.R.Evid. 302(c), a competent defense counsel could reasonably anticipate the military judge forming a preliminary opinion that the evidence concerned the mental condition of the appellant. By virtue of the pretrial litigation, the defense confirmed the military judge's inclination to release the full report should the defense decide to present the expert testimony. It is obvious that the trial defense counsel made a tactical decision that the risk of the release of

the report outweighed the value of the expert testimony.

Having ourselves reviewed the full report in camera, we cannot dispute the wisdom of the defense decision. The report contained sufficient adverse matters—in addition to the ultimate conclusions that the accused did not suffer a severe mental disease or defect and was mentally responsible for his actions—such that a rational trial defense counsel would decide not to force the issue by presenting the testimony of Dr. Maher and Dr. Warden. Therefore, we hold that the defense decision not to offer the expert testimony on the issue of prong two of defense of another was a reasonable tactical decision which we will not second guess. *See United States v. Morgan,* 37 M.J. 407, 410 (C.M.A. 1993); *United States v. Rivas,* 3 M.J. 282, 289 (C.M.A.1977).

Moreover, had the defense raised the issue of mental responsibility through the testimony of Dr. Maher and Dr. Warden, the government was prepared to launch a substantial rebuttal case. The trial counsel was armed with his own experts who conducted a thorough mental examination of the appellant. Furthermore, under Mil.R.Evid. 302(c), the board's full report would have been released to the government. The trial counsel would have acquired additional ammunition to rebut the defense, and he would have learned about other matters adverse to the defense. We likewise hold that the trial defense counsel's decision not to present a mental responsibility defense was a reasonable tactical decision.

Finally, we have closely scrutinized the trial defense counsel's decision in this murder case to forego evidence of a brain injury and lesion which, we assume for analysis, caused impairments affecting judgment, understanding, and communication. While one may question the defense decision upon an initial reading of the briefs, the record as a whole reveals an entirely reasonable defense approach. The trial strategy regarding this issue was thoughtful and reasonable, and as

8. One might logically presume that the appellate defense counsel have similar concerns regarding disclosure of these adverse matters because they

moved that we consider the full board report in camera and maintain it under seal.

analyzed above, it was supported by law and fact. *See generally United States v. Ingham,* 42 M.J. 218, 224 (1995). The defense counsel's performance under the *Strickland* standard was not deficient. In fact, the trial defense counsel's tactical decisions on this issue, as well as their overall performance in this case, reflected diligent preparation, thoughtful strategy, aggressive tactics, and skillful presentation.

We have carefully considered the remaining assignments of error and the matters personally asserted by the appellant pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A.1982), and find them to be without merit.

Accordingly, the findings of guilty and the sentence are affirmed.

Judge TRANT and Judge BROWN concur.