UNITED STATES, Appellee,

v.

Sergeant Wayne M. PARKER, United
States Army, Appellant.

ARMY 9600945.

U.S. Army Court of Criminal Appeals.

12 Jan. 2001.

For Appellant: Lieutenant Colonel Michael E. Smith, JA (on brief).[1]

For Appellee: Colonel Russell S. Estey, JA; Major Mary E. Braisted, JA; Captain Katherine M. Kane, JA (on brief).

Before CAIRNS, Senior Judge, BROWN, and VOWELL, Appellate Military Judges.

## OPINION OF THE COURT

CAIRNS, Senior Judge:

A general court-martial composed of officer and enlisted members convicted the appellant, contrary to his pleas, of rape (two specifications), forcible sodomy, consensual sodomy, assault consummated by a battery, and adultery (three specifications), in violation of Articles 120, 125, 128, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 920, 925, 928, and 934 [hereinafter UCMJ]. The members acquitted the appellant of oppression and maltreatment of a subordinate, four specifications of rape, and one specification of assault consummated by a battery. They sentenced the appellant to a dishonorable discharge, confinement for ten years, forfeiture of all pay and allowances, and reduction to Private E1. The convening authority disapproved the finding of guilty of consensual sodomy, dismissed that specification, reduced the period of confinement to nine years and six months, and approved the remainder of the sentence as adjudged.

Our earlier opinion dealing with interlocutory appellate motions explains the long appellate history in this case. *United States v. Parker*, 53 M.J. 631 (2000). The substantive issues are now joined for our review under Article 66, UCMJ, 10 U.S.C. § 866. We have carefully reviewed the entire record and considered the following thirteen assignments of error:

---

1. Appellate defense counsel who formerly represented the appellant and made appearances on his behalf include: Colonel John T. Phelps II, JA; Colonel Adele H. Odegard, JA; Major Holly S.G. Coffey, JA; Major Leslie A. Nepper, JA; Major Sheila E. McDonald, JA; Major Thomas J. Barrett, JA; Captain Dirk Gifford, JA; and Captain Scott A. de la Vega, JA.

## I

A PUNITIVE DISCHARGE CANNOT BE ADJUDGED AS THE RECORD OF TRIAL IS NON–VERBATIM AND NOT SUBSTANTIALLY COMPLETE BECAUSE IT IS MISSING A VIDEO–TAPED DEPOSITION OF A KEY GOVERNMENT WITNESS INTRODUCED AT TRIAL, THE TRANSCRIPTS OF THAT VIDEOTAPED DEPOSITION PLAYED IN OPEN COURT TO THE MEMBERS, AN UNKNOWN PORTION OF A COLLOQUY BETWEEN THE MILITARY JUDGE, COUNSEL, MEMBERS, AND POSSIBLY A KEY GOVERNMENT WITNESS, THE GOVERNMENT RESPONSE TO THE DEFENSE DISCOVERY REQUEST AND A DIAGRAM USED BY A WITNESS TO PRESENT IMPROPER UNCHARGED MISCONDUCT TO THE PANEL MEMBERS.

## II

THE EVIDENCE IS LEGALLY AND FACTUALLY INSUFFICIENT TO SUPPORT FINDINGS OF GUILTY FOR SPECIFICATION 4 OF CHARGE II (RAPE OF MS. [AL]) BECAUSE THE RECORD IS MISSING THE TRANSCRIPTS CONCERNING THOSE FACTS NECESSARY TO SUPPORT THE CONVICTION.

## III

THE EVIDENCE IS LEGALLY AND FACTUALLY INSUFFICIENT TO SUPPORT FINDINGS OF GUILTY FOR SPECIFICATION 2 OF CHARGE V (ADULTERY WITH MS. [AL]) BECAUSE THE RECORD IS MISSING THE TRANSCRIPTS CONCERNING THOSE FACTS NECESSARY TO SUPPORT THE CONVICTION.

## IV

THE MILITARY JUDGE ERRED AS A MATTER OF LAW WHEN HE ALLOWED, OVER DEFENSE OBJECTION, A GOVERNMENT WITNESS ([AL]) TO TESTIFY TO UNCHARGED MISCONDUCT PURSUANT TO F.R.E. 413, WHERE THE GOVERNMENT FAILED TO PROVIDE ADEQUATE NOTICE PURSUANT TO F.R.E. 413 OF ITS INTENT TO USE THE EVIDENCE, WHERE THE EVIDENCE FAILED TO MEET THE ELEMENTS FOR ADMISSIBILITY PROVIDED WITHIN F.R.E. 413, AND WHERE THE MILITARY JUDGE APPLIED THE WRONG LEGAL STANDARD IN DETERMINING THE ADMISSIBILITY OF THE EVIDENCE.

## V

THE MILITARY JUDGE ERRED AS A MATTER OF LAW WHEN HE ALLOWED THE GOVERNMENT TO PRESENT EVIDENCE, OVER DEFENSE OBJECTION, WITH RESPECT TO A KEY GOVERNMENT WITNESS ([AL]) CONCERNING AN ALLEGED RAPE THAT THE GOVERNMENT CHARGED OCCURRED IN 1995 WHERE THE FACTS SUPPORTING THE ALLEGED RAPE OCCURRED IN 1993, AND WHERE THE MILITARY JUDGE PREVIOUSLY RULED THAT THE GOVERNMENT COULD NOT AMEND THE CHARGE SHEET CHANGING THE DATES, YET ALLOWED THE GOVERNMENT TO PRESENT THE EVIDENCE PURSUANT TO F.R.E. 413, AND ALLOWED THE COURT–MARTIAL PANEL TO FIND APPELLANT GUILTY OF THE CHARGED RAPE BY A VARIANCE AND SUBSTITUTION OF DATES CHANGING THE ALLEGED OFFENSES BY TWO YEARS.

## VI

THE MILITARY JUDGE ERRED AS A MATTER OF LAW WHEN HE ALLOWED, OVER DEFENSE OBJECTION, A GOVERNMENT WITNESS ([KG]) TO TESTIFY TO UNCHARGED MISCONDUCT PURSUANT TO F.R.E. 413, WHERE THE GOVERNMENT FAILED TO PROVIDE ADEQUATE NOTICE PURSUANT TO THE RULE

OF THEIR INTENT TO USE THE EVIDENCE, THE EVIDENCE FAILED TO MEET THE ELEMENTS FOR ADMISSIBILITY PROVIDED WITHIN THE RULE, AND WHERE THE MILITARY JUDGE APPLIED THE WRONG LEGAL STANDARD IN DETERMINING THE ADMISSIBILITY OF THE EVIDENCE.

## VII

WHETHER THE MILITARY JUDGE ERRED BY FAILING TO SUA SPONTE INSTRUCT THE PANEL ABOUT A POSSIBLE MISTAKE OF FACT DEFENSE CONCERNING SPECIFICATION 1 OF CHARGE IV (ASSAULT UPON MS. [KD]),[2] BECAUSE THE EVIDENCE SHOWS APPELLANT COULD HAVE HAD AN HONEST AND REASONABLE BELIEF THAT MS. [KD] CONSENTED BECAUSE OF HER EXTENSIVE PRIOR COURSE OF AGGRESSIVE SEXUAL CONDUCT WITH APPELLANT.

## VIII

THE MILITARY JUDGE ABUSED HIS DISCRETION WHEN HE ALLOWED OVER DEFENSE OBJECTION, A PRIOR CONSISTENT STATEMENT OF A KEY GOVERNMENT WITNESS, MS. [KD], WHERE THE PRIOR STATEMENT WAS MERELY USED TO BOLSTER IN[-]COURT TESTIMONY, WHERE THE PRIOR STATEMENT DID NOT REBUT ANY ALLEGATION OF RECENT FABRICATION, AND WHERE THE MILITARY JUDGE FAILED TO APPLY THE CORRECT LEGAL STANDARD IN DETERMINING ADMISSIBILITY PURSUANT TO M.R.E. 801(D)(1).

## IX

THE MILITARY JUDGE ABUSED HIS DISCRETION WHEN HE FAILED TO GRANT THE DEFENSE MOTION CHALLENGING THREE COURT–MARTIAL PANEL MEMBERS FOR CAUSE BASED UPON IMPLIED BIAS BECAUSE ONE MEMBER WAS PREDISPOSED TO A PARTICULAR SENTENCE, TWO MEMBERS WERE TROUBLED BY THE ACCUSED'S FAILURE TO TESTIFY, AND A THIRD MEMBER WAS FRIENDS WITH THE COMMANDER WHO PREFERRED CHARGES AGAINST THE ACCUSED.

## X

THE MILITARY JUDGE ABUSED HIS DISCRETION WHEN HE ALLOWED A WITNESS TO TESTIFY AS TO THE EXCITED UTTERANCE OF AN ALLEGED RAPE VICTIM (MS. [G]) WHERE THE EXCITED UTTERANCE WAS MADE SEVERAL MONTHS AFTER THE SHOCKING EVENT AND AFTER THE EXCITEMENT OF THE SHOCKING EVENT HAD LONG PASSED. WHILE APPELLANT WAS ULTIMATELY ACQUITTED OF ALL BUT ONE ADULTERY CHARGE WITH RESPECT TO MS. [G], THE SPILL–OVER EFFECT OF SUCH TESTIMONY TAINTED THE COURT–MARTIAL PANEL'S ABILITY TO FAIRLY AND IMPARTIALLY ADJUDICATE THE OTHER CHARGES AND SPECIFICATIONS ESPECIALLY WHERE THE MILITARY JUDGE FAILED TO PROVIDE A SPILL–OVER INSTRUCTION AS PROMISED TO THE DEFENSE.

## XI

THE CONVENING AUTHORITY IMPROPERLY APPLIED U.C.M.J., ART. 58(B) WHEN HE PROVIDED WAIVER OF AUTOMATIC FORFEITURE OF ALL PAY AND ALLOWANCES WHEN APPELLANT SHOULD HAVE BEEN

---

**2.** We granted the appellant's motion to correct this assignment of error by deleting his original assertion that the military judge erred in failing to instruct on mistake of fact regarding Specification 2 of Charge II (rape of Ms. KD) and Specification 2 of Charge III (forcible sodomy of Ms. KD). The appellate defense counsel moved to correct this assignment of error after the government pointed out in their brief that the military judge had, in fact, instructed on the defense of mistake of fact regarding those two specifications.

RECEIVING FULL PAY AND ALLOWANCES DURING THAT TIME PERIOD.

## XII

THE APPLICATION OF ARTICLE 57(a)(1), 10 U.S.C. § 857(a)(1), VIOLATES THE *EX POST FACTO* CLAUSE OF THE CONSTITUTION WITH RESPECT TO APPELLANT.

## XIII

THE ENTIRE FINDINGS OF GUILTY AND THE SENTENCE SHOULD BE SET ASIDE AND DISMISSED BECAUSE OF THE SUBSTANTIAL QUESTIONS RAISED AS TO THIS COURT–MARTIAL'S FAIRNESS AND INTEGRITY DUE TO THE OVERWHELMING NUMBER OF LEGAL ERRORS, IMPROPER RULINGS, MISAPPLICATION OF THE RULES OF EVIDENCE, FAILURE TO PROPERLY RECORD AND PRESERVE THE TRIAL PROCEEDINGS, AND THE PERCEPTION OF A LACK OF FAIRNESS BOTH TO THE APPELLANT AND OF THE MILITARY JUSTICE SYSTEM.

Although we previously granted appellant's motion to withdraw his *Grostefon*[3] claims, we have decided to consider those matters. We have done so because, at the time the appellant moved to withdraw the *Grostefon* matters, it was clear he intended to resubmit matters personally; but, he subsequently failed to submit *Grostefon* matters after the extended litigation concerning representation by appellate defense counsel. Additionally, we have considered all of the matters brought to our attention by the appellant while this appeal has been pending.

On the basis of our Article 66, UCMJ, review, we agree with the appellant's *Grostefon* assertion that the evidence is factually insufficient to support the findings of guilty of the rape of Ms. KD and the assault of Ms. KD. Likewise, the evidence is factually insufficient to support a finding of guilty of forcible sodomy of Ms. KD, although it is sufficient to support the lesser included offense of consensual sodomy with Ms. KD. All other findings of guilty are legally and factually sufficient. Except for Assignments of Error XI and XII, which deal with the ex post facto application of Articles 57(a) and 58b discussed later, the remaining assignments of error are without merit. As for the appellant's remaining *Grostefon* assertions, we hold that appellant's trial and appellate defense counsel were effective in accordance with the standards mandated by *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and *United States v. Scott,* 24 M.J. 186, 188 (C.M.A.1987). All other *Grostefon* matters do not warrant comment or relief.

## Part I: Legal and Factual Sufficiency of the Evidence for Rape, Forcible Sodomy, and Assault of Ms. KD

### a. Facts

In the fall of 1994, the appellant met Ms. KD, a German national who worked on a U.S. Army installation in the community where the appellant was assigned. Within a month of their meeting, they established a sexual relationship and saw each other three to four times per week. KD subsequently learned that the appellant was not divorced and was living with another German woman who was not his wife. KD demanded that he either stop seeing the other woman or their relationship would cease. When the appellant refused to give up his relationship with the other woman, KD was angry and told him that their relationship was over. Thereafter, according to KD's testimony, the appellant harassed KD by showing up at her apartment, "following [her] at the job," and coming over to her girlfriend's apartment. As a result, KD reported to the military police (MPs) that the appellant was harassing her.

Even though KD purportedly decided to end her relationship with the appellant and subsequently complained to the MPs that the appellant was harassing her, she continued to have sexual relations with him. In an effort to explain this apparent paradox, KD testi-

---

3. *United States v. Grostefon,* 12 M.J. 431 (C.M.A. 1982).

fied[4] that she could not resist the appellant because "he had very much power over me." She also admitted that she hoped she could win the appellant back from the other woman.

In December 1994, KD was hospitalized, and she did not see the appellant until about a month later, when she and her girlfriend, SC, went out to an on-post club. Although KD spurned the appellant's friendly advances that evening, she subsequently agreed with the appellant's request to visit her at her apartment so they could talk and play dominoes.

The appellant arrived at KD's apartment around ten o'clock at night and stayed until about midnight. According to KD's testimony, as the appellant was leaving, he made a crude sexual advance which she rebuffed. KD testified that the appellant then tried to kiss her, pushed her, and pulled her hair. She refused to kiss him or cooperate in his sexual demands, and she "fought him with words" by calling him names. At one point, they struggled to the floor. According to KD, the appellant forced her into the bedroom where he penetrated her vaginally with his penis without her consent. KD said she remained still during the attack, hoping it would end quickly. She also attempted to flee but was unsuccessful. Finally, she cooperated with the appellant and suggested ways to enhance his pleasure, all in an attempt to position herself to escape.

KD denied on direct examination that she and the appellant had previously participated in any "mock fights" that led to rough, consensual sexual intercourse. She stated that the appellant was strong and demanding during sex, but he never hit her and was never brutal. On cross-examination, however, she admitted that she had not objected when the appellant had previously pulled her hair "soft" and spanked her "soft" during consensual sexual intercourse.

KD testified that she did not report the alleged rape at or near the time of the incident because she was embarrassed and thought it was "her fault." She did, however, tell her girlfriend, SC—whom she loved as a sister—that the appellant had raped her. On cross-examination, KD admitted that she did not actually realize she had been raped until two days after the intercourse. The court-martial panel acquitted the appellant of this rape (Specification 1 of Charge II).

According to KD, even though she had told her girlfriend, SC, that the appellant had raped her, SC allowed the appellant to move into her apartment. In February 1995, about a month following the first alleged rape, KD and SC planned to go out, and the appellant had agreed to baby-sit SC's children. The appellant called KD and asked her for a ride from an Army installation to SC's apartment. Despite the alleged previous rape, KD agreed to give the appellant a ride. KD's initial explanation on direct examination for giving the appellant a ride within a month of him allegedly raping her was that she did many things while she was with the appellant that she did not understand.

After a night of dancing, KD and SC returned to SC's apartment, where the appellant asked KD for a ride back to the installation. KD agreed. In the car, the appellant persuaded KD to take him to her apartment. It was early in the morning, about 0130 hours. After they played dominoes and ate some food, the appellant indicated a desire to have sexual relations, but KD declined. According to KD, the appellant pulled her hair, undressed her, and sodomized her anally (Specification 2, Charge III). KD said she tried to fight him, but he was pulling her hair "real bad" and she was afraid. As she put it, "I didn't fight much; I was too afraid."

KD testified that the appellant then turned her around, pulled her pubic hair, and had vaginal sexual intercourse with her. (These acts formed the basis for the appellant's convictions of assault (Specification 1, Charge IV) and rape (Specification 2, Charge II).) After some time, "he wanted [her] to go on [her] hands and knees; so he turned [her] around again." At that point, KD escaped to her kitchen. The noise had awakened KD's daughter, and after KD calmed her down and put her back to bed, the appellant embraced

---

4. KD testified in English.

KD and comforted her. They then fell asleep together on the couch.

On cross-examination, KD admitted that not only did she give the appellant rides on this evening, but she had also given him a ride on another occasion between the two alleged rapes. In another attempt to explain her willingness to have contact with a person who had previously raped her, KD testified that the sound of the appellant's voice made her weak, she was dependent upon him, and she was sexually addicted to the appellant. However, she denied that her sexual addiction played any part in her agreement to give the appellant a ride on the night of the second alleged rape. She further denied feeling any sexual weakness for the appellant just before he allegedly raped her the second time.

In contrast, KD testified that she continued to have a sexual relationship with the appellant *after the second alleged rape* because she was emotionally weak and sexually dependent upon the appellant. In June 1995, KD discovered she was pregnant. When she revealed this to SC and sought her help, SC informed KD that she had been having a sexual relationship with the appellant since November 1994. KD denied that she was hurt by the revelation that her best friend was having sex with the appellant. She testified that, "[i]t didn't hurt at all [because] I was, I guess, over it." In July, KD reported to the MPs that the appellant had twice raped her.

On cross-examination, KD admitted to writing a letter to the appellant which constituted manufactured evidence of her mendacity, designed to help the appellant persuade his command to "drop the charges." She claimed she wrote the letter because the appellant told her he would leave her alone if she helped him. KD admitted her willingness to lie for the appellant. KD also admitted to writing a letter to the appellant on 12 February 1995, after the first alleged rape (and maybe after the second) in which she asked, "Why can't we sit down and act like grown ups?" She explained that her intent was to persuade the appellant to treat her normally and not to "talk her down" or to treat her badly.

The appellant took the witness stand in his own defense and admitted having a sexual relationship with KD. He testified in detail that KD enjoyed rough sex in which he pulled her hair and spanked her while penetrating her vaginally from behind. The appellant admitted engaging in consensual oral and anal sodomy with KD and stated that KD enjoyed watching their sexual acts in a mirror. He asserted that all of their sexual acts were consensual and specifically denied raping or forcibly sodomizing KD. The appellant denied ever pulling KD around her apartment by her hair or ever pulling her pubic hair.

### b. Law

The test for legal sufficiency is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found [all] the essential elements of the offense beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see also United States v. Cottrill*, 45 M.J. 485, 487 (1997). For factual sufficiency, the test is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," the members of this court are ourselves "convinced of the accused's guilt beyond a reasonable doubt." *See United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

Rape under Article 120, UCMJ, is composed of two elements:

(a) That the accused committed an act of sexual intercourse; and

(b) That the act of sexual intercourse was done by force and without consent.

*Manual for Courts–Martial*, United States (1995 ed.), Part IV, para. 45b(1) [hereinafter *MCM*, 1995].

Forcible sodomy under Article 125, UCMJ, is composed of two elements:

(a) That the accused engaged in unnatural carnal copulation with a certain other person; and

(b) That the act was done by force and without the consent of the other person.[5]

*MCM*, 1995, Part IV, para. 51.

 Under the law, a mistake of fact that the victim consented to the sexual act constitutes a defense to the charges of rape and forcible sodomy. If an accused has an honest and reasonable belief that the victim consented to sexual intercourse, he cannot be guilty of rape. Likewise, if the accused honestly and reasonably believed that a person consented to unnatural carnal copulation, the accused is not guilty of forcible sodomy, though he would be guilty of consensual sodomy. In all cases, the burden is on the prosecution to establish guilt. If the factfinders are convinced beyond a reasonable doubt that the accused was not under a mistaken belief that the alleged victim consented, the defense of mistake does not exist. Even if the factfinders conclude that the accused was honestly mistaken, if they are convinced beyond a reasonable doubt that his mistake was not reasonable under the circumstances, then the defense of mistake of fact cannot prevail. *See* Rule for Courts–Martial 916(j) [hereinafter R.C.M.]; Dep't of Army Pam 27–9, Legal Services: Military Judges' Benchbook [hereinafter Benchbook], para. 5–11–2 (30 Sept. 1996) (Cl, 30 Jan. 1998).

#### c. Analysis

We are satisfied that rational factfinders could find the appellant guilty of the second alleged rape, forcible sodomy, and assault of KD. In order to do so, they would have to believe KD's version of the events; and, as for the rape and sodomy, they would have to be convinced beyond a reasonable doubt that the appellant did not either honestly or reasonably believe that she consented to the sexual intercourse and sodomy. The evidence viewed objectively in the light most favorable to the prosecution supports such conclusions; hence, the convictions are legally sufficient.

 However, in conducting our factual sufficiency review mandated by Article 66(c), UCMJ, we are not convinced that the government disproved beyond a reasonable doubt the appellant's mistake of fact defense. The appellant may well have honestly and reasonably believed that KD consented to the intercourse and sodomy. Further, the evidence causes us to question KD's credibility sufficiently that we have reasonable doubt concerning her allegations that the sexual activity was by force and without her consent.

KD readily admitted that she and the appellant engaged in a consensual sexual relationship for several months before the first alleged rape. Prior to the first alleged rape, KD claims she told the appellant that the relationship was over because he refused to stop seeing another woman. KD also asserted that she complained to the MPs after the appellant harassed her. Despite KD's actions to end the relationship with the appellant and to report him to the MPs, KD testified that she continued to engage in consensual sexual relations with the appellant.

There are logical and inherent inconsistencies between KD's actions in ending the relationship with the appellant and complaining to the MPs about him, on the one hand, and her continuing the sexual relationship with the appellant after those events, on the other hand. Anticipating that the members might question KD's credibility on this basis, the prosecution sought to explain these inherent inconsistencies by eliciting KD's testimony that she was weak, dependent, and sexually addicted to the appellant. As a further explanation, KD testified that she did not understand her own actions in her relationship with the appellant. Even if we accept her explanations, it seems likely that, at a minimum, KD signaled her equivocal attitudes to the appellant regarding their relationship by her inconsistent behavior. It was within this context that KD claimed the appellant raped her the first time.

---

5. The second element applies in this case because the government charged the appellant with forcible sodomy. If the evidence fails to prove this element beyond a reasonable doubt, an accused may be convicted of the lesser included offense of consensual sodomy which is composed of the first element only.

In her testimony describing the alleged rape, KD asserted that she physically and verbally resisted the appellant's sexual advances. She testified that the appellant was always "strong" and "demanding" during their previous consensual sexual relations, and that the appellant had, with her consent, previously "spanked" her and pulled her hair during sex. After experiencing and considering the events of the evening as a whole, KD testified that she had not actually realized for two days following the episode that she had been raped. The appellant testified that their sexual intercourse was consensual. Not surprisingly, the court-martial panel acquitted the appellant of this offense.

Less than a month following the first alleged rape, KD admitted to being voluntarily in the physical presence of the appellant on several occasions. In addition to an earlier contact, she agreed to give the appellant a ride to and from her girlfriend's apartment on the evening of the second alleged rape. KD actually invited the appellant into her apartment at 0130 hours in the morning. KD could offer no rational explanation as to why she would willingly allow herself to be alone in her apartment with a man who had previously raped her. Instead, she offered two inconsistent explanations for giving the appellant a ride on the evening of the second alleged rape. Initially, on direct examination, KD testified, "I really don't know ... [t]here's many things I've done in this time, while I was with him, that I don't understand." Later, on cross-examination, she stated that it was easier for her to give the appellant a ride than for her girlfriend, SC, to do so. KD specifically denied that her self-diagnosed sexual weakness and addiction for the appellant was part of the reason. KD's testimony regarding why she agreed to have contact with the appellant lacks credibility.

In addition to KD's credibility problem, her description of how she manifested her lack of consent during the second rape raises a substantial question whether a reasonable person would have perceived her nonconsent under the circumstances. In our judgment, her assertion that she did not consent to sexual intercourse during the second rape is not convincing. KD testified that she tried to fight the appellant, but he was pulling her hair "real bad," so "I didn't fight much; I was too afraid." Without providing any other details on how she manifested her nonconsent to the appellant, KD testified as conclusions that she did not consent and that the appellant forcibly sodomized her, pulled her pubic hair to maintain control of her, and penetrated her vaginally.

Under these facts, we are not convinced beyond a reasonable doubt that the appellant did not mistakenly believe that KD consented to sexual intercourse and sodomy. KD had previously sent mixed signals to the appellant about their relationship, and she consented to the appellant's presence in her apartment early in the morning. The history of their relationship included consensual sexual acts which were similar in nature to acts KD claims were nonconsensual. KD admitted that she "did not fight much," and otherwise did not specify how she manifested her nonconsent. After the sexual intercourse and sodomy, KD testified that she and the appellant slept together, while her daughter was sleeping in the next room.

Finally, the evidence as a whole raises serious questions in our minds regarding KD's credibility. Not only was KD's testimony internally inconsistent and illogical, but her inconsistent actions, particularly in continuing a consensual sexual relationship with the appellant after he allegedly raped her twice, raise troublesome questions about her claims of rape. Additionally, she admitted manufacturing evidence and a willingness to lie to Army authorities in an attempt to help the appellant overcome the charges. Given the failure of credible evidence to rebut the appellant's mistake of fact defense and the totality of evidence casting doubt on KD's credibility, we are not convinced beyond a reasonable doubt that the appellant raped, forcibly sodomized, or assaulted KD. Accordingly, we will dismiss those charges in our decretal paragraph. The appellant admitted in his own sworn testimony, however, that he engaged in consensual sodomy with KD. Therefore, we will affirm in our decretal paragraph a finding of guilty of consensual sodomy.

## Part II: Assignments of Error I through VI

### a. Background

In Specification 4 of Charge II, the government charged that, between 1 February *1995* and 31 March 1995, at or near Heidelberg, Germany, the appellant raped Ms. AL. By exceptions and substitutions, the court-martial panel found the appellant guilty of rape occurring between 1 August *1993* and 31 March 1995.

At the time of the alleged offense, AL was an active duty soldier assigned to the same unit as the appellant. At the time of trial, however, AL had been released from active duty and was in the United States. Because she declined to travel to Germany to testify at the appellant's court-martial, AL was deposed on 22 April 1996, in the United States, by the trial counsel in the presence of the appellant. The appellant's trial defense counsel cross-examined her.

At the appellant's court-martial, AL's videotaped deposition was played for the court-martial as the primary and essential evidence that the appellant raped AL. In her videotaped deposition, AL testified that she dated the appellant for one to two months, and they had engaged in consensual sexual intercourse six to seven times before the alleged rape. She testified that their sexual relations occurred in the appellant's car.

AL testified that she hosted a party in her barracks room one evening and that the appellant and other members of the unit attended. After consuming about twelve German beers, she passed out. When she awoke at about 0300 in the morning, the appellant was on top of her and was engaged in vaginal sexual intercourse with her. She testified that when she told the appellant to "get off," he said, "You wanted it," or words to that effect. AL raised her voice above the noise of the television and repeatedly insisted that the appellant stop before he eventually complied with her wishes.

AL testified that she "believed" the alleged rape occurred in March 1993, but she seemed unsure under redirect and cross-examination about exactly when the offense occurred. In other testimony, AL related that she enlisted in the Army in December 1992, attended Advanced Individual Training (AIT) at Fort Lee, and thereafter was assigned to Germany. We judicially note that basic training and AIT normally last for a minimum of thirteen weeks, not counting travel or leave time. AL lived in her barracks in Germany for one to one-and-a-half years and departed Germany in 1995. The record as a whole thus raises the reasonable likelihood that the incident occurred in March 1994, rather than March 1993.

In any event, AL declined to report the incident for several months before confiding in her squad leader that she had been raped. The squad leader told AL that it was her [AL's] decision whether to report the rape. AL decided not to report it because, as she explained in her testimony, even though she had not consented to the intercourse, she had been drinking at the time that the appellant raped her and she had previously consented to having sexual intercourse with him. AL testified that after her squad leader subsequently began to work for the criminal investigation command (CID), investigators sought her out to question her about the incident.

To bolster the government's proof of this rape charge, the trial counsel offered the testimony of KG, an acquaintance of the appellant. KG testified that at a party in February 1996, the appellant tried to have sexual intercourse with her after she had passed out from alcohol intoxication. KG's testimony was admitted, over defense objection based on lack of relevance and timely notice, under Military Rule of Evidence 413 [hereinafter Mil.R.Evid.], as "evidence of similar crimes in sexual assault cases."

In his defense, the appellant interposed alibi by testifying that in March 1993, he was assigned to Fort Meade, Maryland, and he did not arrive at his unit in Germany until 23 July 1993. In addition to asserting an alibi, the appellant testified on direct examination, "I'm just going to say that, yes, I had consensual sex with [AL]. The date of '93 February and March of '93, like I said I was not here. I don't deny the fact that I had a

sexual relationship with her, it was consensual, and that's all I have to say about that." In response to his trial defense counsel's questions, the appellant denied ever having sexual intercourse with AL in her barracks room—and he specifically denied ever having sexual intercourse with her while she was passed out on her bed. He stated that "every time it [sexual intercourse] happened, it always happened in the car."

### b. The Missing Videotaped Deposition

The parties litigated the admissibility of AL's deposition during a pretrial Article 39(a), UCMJ, session. At that point in the record of trial, the court reporter inserted a court reporter's note indicating that the videotaped deposition was included in the allied papers of the record, and that she had marked it after trial as Prosecution Exhibit 13 for identification. At the point in the record when AL's videotaped deposition was actually played for the members of the court-martial, the court reporter did not transcribe AL's testimony verbatim into the record.

The original authenticated record of trial did not include Prosecution Exhibit 13 for identification or any transcript of AL's video-taped testimony. As a result of the missing testimony, the appellant's defense appellate team assigned as its first three errors: (1) that a punitive discharge and confinement for more than six months cannot be approved as the record is not verbatim; (2) that the evidence is legally and factually insufficient to support findings of guilty for the alleged rape of AL; and (3) that the evidence is legally and factually insufficient to support the findings of guilty of adultery with AL.

Shortly after filing a response brief, the government appellate counsel moved to attach to the record of trial AL's videotaped deposition as Prosecution Exhibit 13 for identification.[6] Along with the motion, counsel submitted a certificate of accuracy signed by the court reporter. The court reporter attested therein that she arranged to have the original videotaped deposition copied and that the copies ("one copy each for GAD, DAD, and Clerk of Court" and presumably the one submitted to this court) are true and complete copies of the original which has been maintained in the Office of the Staff Judge Advocate. The government appellate counsel also submitted a Certificate of Correction, signed by the trial counsel, by which the record of trial was corrected by insertion of AL's testimony as Prosecution Exhibit 13 for identification. The trial counsel authenticated the Certificate of Correction under the authority of R.C.M. 1104(a)(2)(B) and 1104(d)(3) because the military judge was retired from active duty and was not available. Finally, the government has submitted proof of service of the Certificate of Correction and the videotape on the appellant.

On consideration of the motion and the provisions of R.C.M. 1104, we are satisfied that the record of trial has been properly corrected by including the videotaped deposition as Prosecution Exhibit 13 for identification. We have viewed the videotape in its entirety. In addition to certifications of the court reporter and trial counsel, as well as the markings on the videotape, the videotape is self-authenticating in that the presence of all the parties is established; AL is identified on the record of the videotape; and the videotape unquestionably records the deposition of AL taken on 22 April 1996. Accordingly, we grant the government's motion to attach Prosecution Exhibit 13 for identification, the videotaped deposition of AL, to the record of trial.

Because the record of trial has been properly corrected by the inclusion of AL's videotape deposition, the appellant's assignment of error that the record is not verbatim lacks merit.[7]

---

6. Inexplicably, the videotape is not marked as "Prosecution Exhibit 13 for identification," but it is otherwise marked as the deposition of AL, taken on 22 April 1996, in the general court-martial case of *United States v. Parker*. It also reflects this court's docket number for this case.

7. The appellant asserted two additional grounds for his position that the record was not verbatim.

First, the appellant asserts that the record failed to reflect a colloquy between the military judge, counsel, a panel member, and possibly a witness. The colloquy occurred at the conclusion of KD's testimony, when a court member asked if they could see the exhibits. Based on our experience, we strongly suspect the missing colloquy related to the housekeeping rules pertaining to when members would be allowed to see exhibits. In

## c. Admissibility of the Videotaped Deposition

The appellant asserts that the military judge erred in admitting the videotaped deposition. During pretrial litigation, the government moved to amend the dates in the specification to allege that the appellant raped AL in 1993, not in 1995, as charged. The defense objected to the amendment, asserting that it would constitute a major amendment after arraignment. Although the military judge denied the government motion to amend the specification, he ruled that the videotape was nevertheless admissible under Mil.R.Evid. 413 as asserted by the government. The record is unclear, but the government's theory of admissibility, apparently adopted by the military judge, was that the videotape constituted evidence in support of the other rapes charged in Specifications 1, 2, 3, 5, and 6 of Charge II under Mil. R.Evid. 413.

When the videotape was played for the court members, the defense interposed no further objections. The trial defense counsel was present during the deposition and cross-examined AL, so the defense knew that her testimony suggested that the rape occurred in 1993, not 1995, as charged. Nevertheless, the defense neither objected to the evidence as irrelevant nor requested a continuance in order to meet the testimony.

After all the evidence had been presented, the military judge instructed the members, *inter alia*, that if they were convinced beyond a reasonable doubt that the offense was committed at a time which differed slightly from the exact time in the specification, they could make minor modifications in reaching their findings by changing the time alleged, provided they did not change the nature or identity of the offense charged. The members found the appellant guilty by exceptions

and substitutions of raping AL between August 1993 and March 1995, changing the earliest possible date of the rape by seventeen months (which was approximately when the appellant arrived in Germany).

 A variance between pleading and proof occurs when the evidence at trial demonstrates that the accused committed the offense charged, "but the proof does not conform strictly with the offense alleged in the charge." *United States v. Allen*, 50 M.J. 84, 86 (1999) (citing *United States v. Lee*, 1 M.J. 15, 16 (C.M.A.1975)). Such a variance is fatal, and findings thereon must be reversed, if the variance is material and substantially prejudices the appellant. *Id.* (quoting *United States v. Hunt*, 37 M.J. 344, 347 (C.M.A.1993)); *see also United States v. Willis*, 50 M.J. 841, 843 (Army Ct.Crim. App.), *rev. granted*, 52 M.J. 412 (1999). Generally, "[i]n order to show prejudice, appellant must show both that he was misled by the language of [the charge], such that he was unable adequately to prepare for trial, and that the variance puts him at risk of another prosecution for the same offense." *Allen*, 50 M.J. at 86 (citing *Lee*, 1 M.J. at 16).

 Here, the appellant has failed to demonstrate that the change in the date of the alleged rape was a material variance that substantially prejudiced him.[8] The date was not an essential element of the offense, and the change in dates was not otherwise material. *Cf. United States v. Whitt*, 21 M.J. 658, 661 (A.C.M.R.1985) (change in date by one year not a major change). The defense was not surprised by the difference in proof and pleadings; they neither claimed surprise at trial nor asked for a continuance. Certainly by their presence at the deposition, they had at least one week notice that AL would testify that the date was 1993, not 1995. Hence,

---

any event, the omission was pertinent to KD's allegation that the appellant raped her. Inasmuch as we have found the appellant's conviction of rape of KD factually insufficient and we will be dismissing that specification in our decretal paragraph, this additional grounds for asserting a nonverbatim record is either harmless or moot. Second, the appellant points out that a diagram sketched by KG, which was never offered or admitted, is missing from the record. While this is true, we find this omission insub-

stantial and nonprejudicial because the diagram was of marginal relevance to her testimony and the issues in this case.

8. When the trial defense counsel made a motion for a finding of not guilty after the government's case-in-chief, he was unable to articulate prejudice. Likewise, the defense was unable to show their inability to defend based on a theory of having been misled.

the defense knew exactly what AL's testimony would be at trial and had advance opportunity to prepare a rebuttal on this issue.[9] We are satisfied that, under the circumstances, the appellant is not at risk of another prosecution for the same offense. We hold that the variance was not fatal as it was neither material nor prejudicial.

Finally, we reject the appellant's claim that the deposition was inadmissible because the military judge disallowed an amendment to the specification after arraignment yet admitted the deposition under Mil.R.Evid. 413. First, we believe the military judge could have allowed the post-arraignment amendment, as it constituted a minor change under R.C.M. 603(a) that would not have prejudiced a substantial right of the appellant. R.C.M. 603(c). Second, we do not believe the military judge needed to rely on Mil.R.Evid. 413 as a basis to admit the deposition. Indeed, we reject this rationale which embraced the government's convoluted theory of admissibility at trial. *Cf. United States v. Morris*, 49 M.J. 227, 230 (1998); *United States v. Francis*, 54 M.J. 636, 639 (Army Ct.Crim. App.2000). We hold, however, that the deposition was properly admissible as evidence relevant to the charged misconduct alleged in Specification 4 of Charge II, the very rape at issue.

### d. KG's Testimony under Military Rule of Evidence 413

The appellant asserts in Assignment of Error VI that the military judge erred when he allowed KG to testify, over defense objection, to uncharged misconduct under the provisions of Mil.R.Evid. 413. The appellant presents three bases: (1) that the government failed to provide adequate notice under the rule; (2) that the evidence failed to meet the elements for admissibility provided under the rule; and (3) that the military judge applied the wrong legal standard for admissi-

bility when he failed to apply Mil.R.Evid. 403. We find no prejudicial error.

First, the defense was provided adequate notice under the rule of the government's intent to offer the testimony of KG under Mil.R.Evid. 413. KG was interviewed on 23 February 1996 by a military police investigator who prepared a sworn statement summarizing the substance of the interview and thus her prospective testimony. The trial counsel first provided the trial defense counsel a copy of the agent's statement in mid-March 1996. Further, the trial counsel listed KG on his witness list and provided it to the defense in compliance with the defense discovery request. One week prior to the 29 April 1996 trial date, the trial counsel served another copy of KG's prospective testimony on the trial defense counsel. Four days before trial, the trial counsel explicitly notified the trial defense counsel of his intent to offer KG's testimony under Mil.R.Evid. 413. The military judge ruled that the defense had adequate notice of the substance of KG's prospective testimony and the government's intent to offer KG's testimony under Mil. R.Evid. 413, but he required the government to delay putting her on the witness stand until five days following formal notice.

As pointed out by the appellate defense counsel, Mil.R.Evid. 413 was not in effect at the time of the appellant's trial.[10] However, Federal Rule of Evidence 413 [hereinafter Fed.R.Evid.], upon which Mil.R.Evid. 413 is based, became effective on 9 July 1995. Under the provisions of Mil.R.Evid. 1102 in effect at the time of the appellant's trial, "[a]mendments to the Federal Rules of Evidence shall apply to the Military Rules of Evidence 180 days after the effective date of such amendments unless action to the contrary is taken by the President." [11] Therefore, because the President took no such contrary action, by our calculations, Fed. R.Evid. 413 was applicable in trials by

---

9. We note that there are indications in the pretrial litigation that the defense was aware of the issue regarding the date of the allegation prior to the deposition.

10. In accordance with the executive order which promulgated Mil.R.Evid. 413, the rule was to become effective for courts-martial in which ar-

raignment was completed on or after 26 June 1998. The appellant was arraigned on 25 March 1996.

11. A change to Mil.R.Evid. 1102, effective 27 May 1998, requires an eighteen-month waiting period before such federal rules apply to courts-martial.

courts-martial on or about 5 January 1996. As the appellant's trial commenced on 25 March 1996, Fed.R.Evid. 413 properly applied through the provisions of Mil.R.Evid. 1102.

 In cases in which the government intends to offer evidence under Fed.R.Evid. 413, the rule requires the government to "disclose the evidence" to the defense at least fifteen days before the scheduled date of trial or "at such later time as the court may allow for good cause." In this case, the military judge and counsel litigated the disclosure requirement by mistakenly relying on the five-day time requirements provided in the draft of Mil.R.Evid. 413. However, even applying the more stringent fifteen-day disclosure requirement of Fed.R.Evid. 413, which we believe was the correct notice requirement, we are satisfied that the government complied. The evidence was provided to the defense in mid-March, well before the fifteen-day notice requirement under the rule. Under the plain language of the rule, the government must "disclose the evidence." The rule does not require the government to formally announce to the defense that they intended to offer the evidence under Fed. R.Evid. 413. Even if that were the rule, we conclude that the military judge reasonably extended the time for notification under the rule, based on good cause, providing the defense with more than adequate time to prepare for and meet the evidence.

 Second, we disagree with the appellant's contention that the evidence failed to meet the elemental requirements for admissibility. Both the pretrial proffer and KG's actual trial testimony reveal the following: KG was drinking at a party attended by the appellant and others. KG was married to a soldier but was having an affair with the host of the party, Sergeant (SGT) P, who was also married. After KG became drunk, she and SGT P went downstairs into a room away from the party with the intention of having sexual intercourse. The next thing KG remembers is waking up in the middle of the night on a mattress located on SGT P's living room floor. She was naked from the waist down. The appellant was lying next to her, pressed up against her body and her "behind." The appellant was also naked from the waist down. In her pretrial statement to an MP investigator, KG stated her belief that the appellant had sexually assaulted her by having sexual intercourse with her while she was passed out. KG testified at trial that she believed the appellant was trying to have sexual intercourse with her.

The appellant asserts that KG's testimony fails to reveal facts sufficient to qualify as "sexual contact" under Mil.R.Evid. 413,[12] which provides in pertinent part:

(a) In a court-martial in which the accused is charged with an offense of sexual assault, evidence of the accused's commission of one or more offenses of sexual assault is admissible and may be considered for its bearing on any matter to which it is relevant.

. . . .

(d) For purposes of this rule, "offenses of sexual assault" means an offense punishable under the Uniform Code of Military Justice . . . that involved—

(1) any sexual act or sexual contact, without consent, proscribed by the Uniform Code of Military Justice . . . ;

(2) contact, without the consent of the victim, between any part of the accused's body . . . and the genitals or anus of another person;

(1) contact between the penis and the vulva or the penis and the anus, and for purposes of this rule, contact occurs upon penetration, however slight, of the penis into the vulva or anus;

. . . .

(f) For purposes of this rule, the term "sexual contact" means the intentional touching, either directly or through clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to . . . gratify the sexual desire of any person.

---

12. We set forth the provisions of Mil.R.Evid. 413, rather than the Federal rule, for clarity and to avoid confusion. As for subparagraphs (a) through (d) the two rules are virtually identical, but Mil.R.Evid. 413 appropriately refers to "court-martial" and "Uniform Code of Military Justice," whereas Fed.R.Evid. 413 refers to "criminal case" and "title 18, United States Code." Military Rule of Evidence 413 adds subparagraphs (e) and (f) as follows:

(e) For purposes of this rule, the term "sexual act" means:

(3) contact, without the consent of the victim, between the genitals or anus of the accused and any part of another person's body;

. . . .

(5) an attempt . . . to engage in conduct described in paragraphs (1) through (4).

We are satisfied that both KG's pretrial statement and her trial testimony alleged that the appellant committed an offense of sexual assault within the meaning of Fed. R.Evid. 413. In both her pretrial statement and trial testimony, KG alleged at a minimum facts sufficient to qualify as actual sexual contact (i.e., sexual assault by intentional touching of the appellant's genitalia to the victim's buttocks with intent to gratify the sexual desires of the appellant) or as an attempt to engage in a sexual act (i.e., a sexual assault or unconsensual sexual intercourse). KG explicitly related that when she woke up, she was nude from the waist down, and the appellant, who was also nude from the waist down, was pressed up against her. She felt him pressed against her "behind," and the clear implication of such testimony was that she felt appellant's nude body parts pressed against her buttocks. She moved away from the appellant, and he tried to persuade her to move back. Believing the appellant was trying to have sexual intercourse with her, she woke up her boyfriend for help and told him the appellant was trying to have sexual intercourse with her. Her testimony plainly fulfilled the definitional requirements of an attempt to engage in a "sexual contact" under Fed.R.Evid. 413.

 Finally, the appellant correctly asserts the military judge erred when he failed to apply a Mil.R.Evid. 403 balancing test before admitting KG's testimony under Fed. R.Evid. 413. *See United States v. Wright*, 53 M.J. 476, 482 (2000); *United States v. Green*, 50 M.J. 835, 839 (1999).[13] Nevertheless, we find no prejudice. If the military judge had properly applied the balance, we are certain he would have found the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. KG's testimony revealed a remarkably similar modus operandi to the rape of AL. In both cases, the appellant chose to take advantage of his victims, who had passed out from excessive alcohol consumption at a party, by engaging in, or attempting to engage in, sexual intercourse. In neither case did he forcibly pursue the sexual act after his victim awoke and protested. KG's testimony was not confusing, misleading, or cumulative. The appellant's assault of KG was relatively close in time (within two years) to his assault of AL. Under these circumstances, we hold the Mil.R.Evid. 403 balance favored admissibility,[14] and we are satisfied the military judge would have similarly struck the balance in favor of admissibility.

### e. Legal and Factual Sufficiency of Rape of AL

 In his assignments of error, the appellant's challenge to the legal and factual sufficiency of his conviction for the rape of AL was based on the missing deposition of the victim, but those errors were assigned before the record was corrected. Now that the record has been corrected to include the previously missing deposition, his asserted basis for insufficiency necessarily fails. Nevertheless, we have conducted an independent and thorough review of the record and assessed the sufficiency of the evidence for this offense under Article 66(c), UCMJ.

As defined by its elements, supra, rape is an act of sexual intercourse done by force and without consent. "When a victim is incapable of consenting because she is asleep, unconscious, or intoxicated to the extent that she lacks the mental capacity to consent, no greater force is required than that necessary

---

**13.** The applicability of Mil.R.Evid. 403 was an unsettled issue at the time of trial.

**14.** The *MCM*'s analysis states, "When 'weighing the probative value of such [rule 413] evidence, the court may, as part of its rule 403 determination, consider proximity in time to the charged or predicate misconduct; similarity to the charged or predicate misconduct; frequency of the other acts; surrounding circumstances; relevant intervening events; and other relevant similarities or differences.' (Report of the Judicial Conference of the United States on the Admission of Character Evidence in Certain Sexual Misconduct Cases)."

to achieve penetration." Benchbook, para. 3–45–1 note 11.

Viewing the evidence in the light most favorable to the prosecution, we are satisfied that a rational trier of fact could find all the elements of rape beyond a reasonable doubt. Accordingly, we hold the evidence was legally sufficient. Likewise, our de novo review of the record convinces us beyond a reasonable doubt that the appellant committed an act of sexual intercourse upon AL by force and without her consent. Based on AL's credible and compelling testimony, we find as fact that she awoke from alcoholic unconsciousness to find the appellant engaged in sexual intercourse with her.[15] We further find beyond a reasonable doubt that, at the time the appellant penetrated AL, she had not given her consent and was incapable of giving her consent because she had passed out from over-indulgence in alcohol.

We specifically reject as a factual matter the appellant's denial of this offense. Overall, the appellant's testimony that he did not engage in sexual intercourse with AL after she passed out was not credible. Moreover, his denial of ever engaging in sexual intercourse with AL in her barracks room eliminates any claim he might otherwise have had of a mistaken belief that AL consented. Accordingly, based on all the evidence and our credibility determinations, we are satisfied beyond a reasonable doubt of the appellant's guilt of the rape of AL.

## Part III. Effective Assistance of Counsel

Although not assigned as a separate error, the appellate record is replete with the appellant's allegations and aspersions of ineffective assistance of counsel, both at the trial and the appellate level. We have carefully scrutinized this record to ensure the appellant has been afforded effective assistance of counsel before, during, and after trial. Military law guarantees nothing less, and we reaffirm our commitment to ensure that soldiers' rights to effective counsel are protected. *Cf. United States v. Russell*, 48 M.J. 139, 140 (1998); *United States v. Lindsey*, 48 M.J. 93, 97 (1998); *United States v. Hicks*, 47 M.J.

90, 92 (1997); *United States v. Cole*, 54 M.J. 572, 588 (Army Ct.Crim.App.2000).

In evaluating claims of ineffective assistance of counsel, we apply the two-pronged test enunciated in *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052:

> First, the [appellant] must show that the counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [appellant] by the sixth amendment. Second the [appellant] must show that the deficient performance prejudiced the defense. This requires showing that the counsel's errors were so serious as to deprive the [appellant] of a fair trial, a trial whose result is reliable.

*See Scott*, 24 M.J. 186.

The burden is upon one who claims ineffective assistance of counsel to establish each prong of *Strickland*. In satisfying this burden, an appellant "must surmount a very high hurdle," *United States v. Alves*, 53 M.J. 286, 289 (2000) (citing *United States v. Moulton*, 47 M.J. 227, 229 (1997)), and overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. "Because '[j]udicial scrutiny of counsel's performance must be highly deferential,' the appellate courts will not second-guess the strategic or tactical decisions of the trial defense counsel." *United States v. Clemente*, 51 M.J. 547, 550 (Army Ct.Crim.App.1999) (citing *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052); *see also Cole*, 54 M.J. 572, 588.

We have searched this record from start to finish for any evidence that trial or appellate counsel failed to meet the standards articulated by the United States Supreme Court. We have found no such deficiencies. On the contrary, we are compelled to acknowledge the obviously thorough preparation and the thoughtful, skillful, and aggressive presentation by the trial defense counsel in this case. They presented a coherent and coordinated

---

15. The appellant continued his sexual intercourse with AL for a period of time after she made her nonconsent explicitly known. The rape of AL could alternatively rest on this factual theory.

case theory that the appellant was the victim of "sex, lies, and a videotape." From pretrial litigation to voir dire and opening statements, through the presentation of evidence and closing arguments, the defense hammered home its theme that the case against the appellant all began with one unreported and false allegation of rape that snow-balled into multiple false allegations by appellant's spurned lovers. The trial defense counsel skillfully attacked the credibility of individual victims/witnesses and advanced a plausible argument that the victims were colluding against the appellant because he had played a wide and crowded field of romantic games. In the end, the trial defense team secured acquittals in four of six rape specifications, one of two forcible sodomy specifications, one of two assault specifications, and the maltreatment charge and specification. Not only were they successful in securing these substantial acquittals, they carefully preserved for appellate review numerous issues. Indeed, the trial defense counsel were unrelenting in requesting that the military judge support his rulings with findings of fact and conclusions of law. On consideration of this record, we are satisfied beyond any doubt that the appellant was afforded effective assistance of counsel at trial.

We next turn to whether the appellant has been afforded effective assistance of appellate defense counsel. "The same standards of assessing effective assistance of counsel at trial under *Strickland v. Washington* apply to appellate defense counsel in their representation of clients on appeal." *Parker*, 53 M.J. at 638. As detailed in our previous opinion, the appellant submitted a myriad of complaints regarding his appellate defense counsel. We deferred forming an opinion regarding the effective assistance of appellate counsel issue until we read the record of

trial because without the full context of the record, it was not possible to fairly and fully analyze the appellant's complaints.[16]

We have scrutinized this record for evidence of ineffective assistance of appellate defense counsel, and we have found none. The appellate defense counsel identified and briefed thirteen errors and obviously assisted the appellant with at least the twelve typewritten *Grostefon* matters. All of the assigned errors were appropriately raised and cogently briefed. On our independent review of the record, we did not identify any errors left uncovered by the appellate defense counsel. Accordingly, on consideration of the record of trial and the appellant's complaints, we hold that the appellant was not denied effective assistance of appellate defense counsel.

We would be remiss if we did not point out the unfortunate irony of the appellant's unrelenting attacks on his appellate defense counsel. Because of his unreasonable and unjustified dismissal of at least four different lead appellate defense counsel,[17] not to mention uncounted numbers of supervisors and co-counsel who have worked on his case, the appellant substantially contributed to the delay in the relief we grant today. Appellants and appellate defense counsel would do well to heed the lessons of this case: (1) lawyers must continue to diligently meet their obligation to keep their clients fully informed, recognizing the profound stress and anxiety inherent in incarceration; and (2) clients are better served when they trust in the professional judgment of those sworn to represent them zealously within the bounds of law.

We have carefully considered the remaining assignments of error and *Grostefon* matters and hold they do not warrant relief.[18]

---

**16.** Apparently, one of the key issues which generated conflict between the appellant and his half-dozen lead appellate defense counsel was the appellant's insistence on demanding the production of missing portions of the record, particularly the videotape. Part I of this opinion addresses the missing videotape, the primary portion of the record that was at one time missing. We have resolved the issues presented by the videotape in accordance with the law.

**17.** *See Parker*, 53 M.J. at 642.

**18.** In assignment of Error XII, the appellant asserts that he is within the class of persons affected by *United States v. Gorski*, 47 M.J. 370 (1997). The government concedes that he is entitled to relief. The *Gorski* issue and its remedy are administrative in nature and do not affect the approved sentence. If the *Gorski* issue is still pertinent when this case is returned to us for further review, we will refer it to The Judge Advocate General, in accordance with our normal practice.

The findings of guilty of Specification 2 of Charge II and Specification 1 of Charge IV are set aside and Specification 2 of Charge II and Specification 1 of Charge IV are dismissed. The court affirms only so much of the findings of guilty of Specification 2 of Charge III as finds that the appellant did between 1 February 1995 and 28 February 1995, commit sodomy with Ms. [KD]. The remaining findings of guilty are affirmed. The sentence is set aside. The same or a different convening authority may order a rehearing on the sentence. If the convening authority determines a rehearing on the sentence is impracticable, he may approve a sentence of no punishment.

Judge BROWN and Judge VOWELL concur.